STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. DAVID GUY BALDWIN, DEFENDANT-APPELLANT.

Argued March 23, 1966—Decided June 27, 1966.

380

*Mr. Harold Kaplan* argued the cause for appellant.

*Mr. Richard A. Grossman,* Assistant Prosecutor of Ocean County, argued the cause for respondent.

The opinion of the court was delivered by

WEINTRAUB, C. J. David Guy Baldwin was convicted of the murder in the first degree of Anthony Scannella and was sentenced to life imprisonment pursuant to the jury's recommendation. He appealed directly to us. *R. R.* 1:2–1(c). Before argument, the matter was remanded to the trial court to permit a motion for a new trial based upon recanting by a State's witness. That motion was denied, and the order thereon is before us with the main appeal.

Defendant, Scannella (the deceased), Joseph La Macchio and Louis Tuccillo, were jointly indicted for robbery. Scannella confessed to his part in the robbery and agreed to testify for the State against the codefendants. The jury could readily find defendant knew Scannella had agreed so to testify, and the State's thesis was that defendant killed Scannella to silence him. The robbery trial was scheduled for Monday, October 5, 1964. The homicide occurred during the morning of Saturday, October 3.

The proof was clear that defendant and Scannella were together during the evening of October 2 and the early morning of October 3. Louis Tuccillo, one of the codefendants in the robbery case, testified he loaned his car to defendant on October 2. Using that car, defendant and Scannella visited a number of places. They were together at a bar in Trenton at a time approaching midnight, and still later at a restaurant in that city. Thereafter defendant and Scannella were at the Demi Club in Langhorne, Pennsylvania. They left the club together at about 4:30 A. M. in the Tuccillo car. At about 7:00 A. M. defendant was alone in the car near Trenton. The evidence indicates strongly that Scannella was shot at about 6:00 A. M. The locale was a remote spot in the State Game Preserve, Colliers Mills, in Jackson Township.

The Tuccillo automobile figured prominently in the proof. It was a 1958 Plymouth in poor operating order. It had to be pushed to be started at 4:30 A. M. at the Demi Club. October 3 happened to be the opening of the bow-and-arrow hunting season. Hunters at the preserve testified that they

saw a car resembling the Tuccillo auto and emitting a loud engine knock, proceed toward the spot where the body of the deceased was later found, and then away from that area; and that gunshots, notable because hunting was then permitted only by bow and arrow, were heard at about 6:00 A. M. The car broke down near Trenton, and because of the breakdown, defendant's presence there at about 7:00 A. M. was established through a service-station operator whom defendant called for aid. The service station was located 18 to 25 miles from Colliers Mills. Soil and weeds were recovered from the car, vegetation being found both in the car and hanging from the rear bumper. There was testimony identifying the soil samples so recovered with the soil of the murder area.

Also found at the scene of the murder was a comb which, inferentially, could have been dropped by the killer. Expert testimony, actually of little probative value, was to the effect that hair particles thereon were of a general category into which defendant's hair would fall.

There was testimony that defendant was familiar with the area within the hunting preserve.

The State produced Anthony Patricella, who testified that in August of 1964 defendant offered him $15,000 to $20,000 to do away with Scannella, defendant suggesting that lye be injected into Scannella's vein. Scannella apparently was a narcotics user. Richard Cordine, who met defendant while defendant was in jail on this homicide charge, testified that defendant said it was just his luck that it was opening day of the bow-and-arrow season, and that if the case against him became "warm," he might offer a plea to murder in the second degree. These statements, although devoid of a direct admission, were nonetheless inculpatory. It was the recantation by Cordine which led to the application for a new trial to which we have referred and of which we will say more later on.

The defense acknowledged that defendant and Scannella were together until 4:30 A. M. The defense contended their attitude was one of warm friendship. Indeed the defense showed that Scannella was wearing defendant's shirt and

jacket when he was slain. The defense contended, but without direct proof, that Scannella had decided not to testify for the State in the robbery case, and in support of that thesis the defense offered testimony designed to show that Scannella was about to change counsel. The trial court's ruling on that offer presents one of the issues to which we will later refer. The State countered with the contention that the show of friendship was but a pretense; that defendant intentionally took Scannella to places where they would be seen in a jovial mood in anticipation of the charge of motivation the State here makes. We add that robbery of Scannella was negated; the sum $194.88 was found on his person.

Defendant, who was the only one who could say when and where he and Scannella parted after leaving Langhorne, Pennsylvania, together at 4:30 A. M., did not take the stand.

## I.

The first issue revolves about the subject of alibi. By bill of particulars, the State fixed the time of the homicide between 4:30 A. M. and 10:00 A. M. The spread is between the time when Scannella was last seen alive and the time when his body was found.

The State demanded a bill of particulars of defendant under R. R. 3:5–9(a), which reads:

"If a defendant is to rely in any way on an alibi, he shall, on written demand of the prosecuting attorney, furnish a written bill of particulars, signed by him, and stating the specific place or places at which the defendant claims to have been at the time of the alleged offense, and the names and addresses of the witnesses upon whom he intends to rely to establish such alibi. Such particulars shall be furnished the prosecuting attorney within 10 days from the service of such demand."

The defendant replied:

"1) The specific places at which I was at the time of the offense alleged against me: From the hours of approximately 4:30 a.m. Saturday morning, October 3rd, 1964 until approximately 7:00 a.m. on said morning, I was enroute in a 1957 green two-door Plymouth auto-

mobile from Trenton, New Jersey, to Seaside, New Jersey, and returning to Trenton, making the trip to the best of my present recollection by passing through Yardville, Allentown, Jackson Township, Lakehurst and Toms River.

2) The names and addresses of the witnesses upon whom I intend to rely in order to establish my alibi, subject to certain additional inquiries with respect to presently unknown witnesses are:

A) David Guy Baldwin, the undersigned.

B) A woman, name and address presently unknown to me, except that I believe her first name to be either Loretta or Lola and her residence to be Seaside, who has reddish-brown hair, is approximately 30 to 35 years of age, is approximately 5 ft. 5 in. in height and about 125 to 130 lb. in weight.

C) A man whose name and address is presently unknown to me, driving a 1953 or 1956 Mercury, who stopped and assisted me when my car broke down somewhere between Allentown and Trenton at about 7:00 A. M. Saturday morning, October 3rd, but whom I believe to be an employee at Thermoids.

D) One or more service station attendants whose names and addresses I believe to be: Elmer Schappell, 3151 Broad Street, Trenton, New Jersey, and Elmer Huntington, 717 Trenton Road, Fairless Hills, Pennsylvania, who are employed at an Esso Station in the vicinity of the Broad Street Circle which is called the White Horse Circle, on Broad Street in Trenton, one of whom returned with me to my car and towed the same to the station and thereafter again towed the car into the City of Trenton."

We note that the course of travel so specified would take the defendant on a route which would pass close by the scene of the murder, the scene being reached by a rather brief stretch of dirt road from the highway running from Allentown to Lakehurst.

Defendant thereafter made a demand upon the State under *R. R.* 3:5–9(b) which reads:

"Within 10 days after receipt of such bill of particulars from the defendant, the prosecuting attorney shall, on written demand therefor, furnish the defendant or his attorney with a written bill of particulars stating the names and addresses of the witnesses upon whom the State intends to rely to establish defendant's presence at the scene of the alleged offense."

The State did not respond. The reason was that defendant's demand was mislaid and did not reach the assistant prosecutor handling the case. Defendant made no pretrial motion

to compel an answer, but rather drew attention to the subject for the first time when the State offered one of the hunters as a witness. None of the witnesses for the State in fact testified directly to the presence of defendant at the scene of the crime. The State's case was circumstantial.

The issue arose on the third day of trial, a Wednesday. The prosecutor offered to permit the defense to examine at once the statements of the hunters. The trial court so ordered and directed that none of those witnesses should testify until the following Monday, to permit the defense to investigate them. Defense counsel at first declined to accept the statements but did take them the following day.

The State urges with much merit that the "alibi" supplied by defendant in response to the demand was spurious. Alibi is a claim that defendant was elsewhere at the time of the crime and therefore could not have committed it. *State v. Mucci*, 25 *N. J.* 423, 431 (1957) ; 1 *Wigmore, Evidence* (3d ed. 1940), § 136, *p.* 570. In calling upon a defendant to reveal a claim of that kind before trial, our rule is designed "to avoid surprise at trial by the sudden introduction of a factual claim which cannot be investigated unless the trial is recessed to that end." *State v. Garvin*, 44 *N. J.* 268, 272–273 (1965). Our rule replaced a statute, *R. S.* 2:190–7, adopted in 1934. As the statement annexed to the legislative bill recited, the purpose of that act was "to do away with the existing unfairness in criminal trials of a surprise alibi and at the same time to give defendant equivalent information as to the State's case."

Tested in the light of the foregoing reason for the alibi rule, it is plain that defendant revealed nothing in advance of trial. He revealed nothing for at least two reasons. The first is that he disclosed nothing which could be investigated with profit. He described a route of travel which in and of itself was consistent with guilt unless the bill of particulars meant that his travel between the terminal points was uninterrupted. If the answer is read that way, then only two persons referred to in the bill of particulars could testify in

support of that assertion. One would be the defendant who of course could not be interviewed. The other would be the woman described in item "B," whose very existence has never been verified. So far as the record of the trial is concerned, she is no more than a phantom. Thus the bill of particulars revealed nothing of definitive value. But more importantly, the representation that the claim of alibi would be made at the trial was not fulfilled. No such claim was even asserted at the trial, and no witness testified in support of it. Defendant himself, the key to the alibi claim, did not take the stand. Thus the purpose of the alibi rule—to prevent a surprise at trial—was never met. In these circumstances it is difficult to accept seriously a claim that defendant was grievously hurt by the State's failure to list the witnesses it would produce to combat the proof he never presented.

 Further, the defense could readily have obviated the problem by a pretrial motion to compel the State to answer. The ultimate question, if one accepts defendant's disclosure as constituting an alibi, is whether our rule requires the State, upon a cross-demand, to disclose the names of witnesses who will implicate a defendant circumstantially rather than directly. *R. R.* 3:5–9(b), quoted above, requires the State to identify the witnesses upon whom it will rely "to establish defendant's presence at the scene of the alleged offense," phrasing which may be less pervasive than, let us say, "to establish defendant's guilt." In *State v. Rogers,* 30 *N. J. Super.* 239 (*Cty. Ct.* 1954), it was held that the rule did not apply to circumstantial evidence. Defendant argues that *State v. Driver,* 38 *N. J.* 255, 288–290 (1962), is to the contrary. It is not, since it did not involve our alibi rule but rather an order expressly enjoining the State to name all witnesses it would rely upon to establish, "directly or circumstantially," the defendant's presence at the scene of the crime. We need not, however, pass upon the meaning of the alibi rule. The State does not press the issue. It did not refuse to disclose any of its witnesses; the failure to answer was due to misdirection of the demand within the prosecutor's office.

The point we make is that if the alibi rule does deal with circumstantial proof, defendant knew before trial that the State had not met his demand, but nonetheless he made no motion to compel compliance.

Indeed defendant admits knowing of some of the potential witnesses. He knew about the soil studies, for, prior to trial, the materials were made available to the defense for expert study. Rather defendant seeks somehow to differentiate between the hunters and the other witnesses whose total testimony wove the web about him. The distinction has no substance. We are satisfied the defense had to know the State would rely upon other witnesses, and yet, despite the obvious proposition that quarrels as to discovery should be fought out prior to trial, the defense chose to sit back in the hope of gaining some advantage at trial.

Still further, our rule does not compel the suppression of proof as the sole remedy for failure of either party to comply with it. *R. R.* 3:5–9(d) provides:

"If such bill of particulars is not furnished as required, the party in default may be excluded from presenting any evidence at the trial as to defendant's absence from, or presence at, respectively, the scene of the alleged offense, or the court may impose such conditions and grant such adjournment as the ends of justice may require."

Here the trial court appropriately required the State to furnish copies of the statements of the witnesses at once and to withhold their testimony for some four days.

Finally, we see no evidence of prejudice in fact and hence no basis for reversal even if there were error. See *State v. Coleman,* 46 *N. J.* 16, 28 (1965). Even at the time of argument before us, the defense was unable to point to any disadvantage. The defense suggested only that, had it known the State had found hunters who could offer the testimony we have already described, the defense might have circularized all licensed bow-and-arrow hunters (they exceed 21,000), in the hope, that someone might emerge with something.

Under these circumstances, we see no basis for complaint.

## II.

As we noted above, the State contended defendant killed Scannella to silence him as a prospective witness at the robbery trial.

██ A defendant's involvement in another criminal affair may be proved to show motive, malice or intent. *State v. Puchalski*, 45 *N. J.* 97 (1965); *State v. Anderson*, 35 *N. J.* 472, 483 (1961); *State v. Butler*, 32 *N. J.* 166, 187–188, *cert.* denied, 362 *U. S.* 984, 80 *S. Ct.* 1074, 4 *L. Ed. 2d* 1,019 (1960); *State v. Donohue*, 2 *N. J.* 381, 388 (1949). Here the emphasis was not upon defendant's guilt of that crime, but rather upon the prospect that Scannella would be the instrument of defendant's conviction of it. To that end, it was proper to show Scannella's intent to testify and that defendant knew it. Statements made by the deceased of his intent to be a witness for the State were directly probative of that state of mind.

██ As we understand defendant, he complains that the evidence obliged him to defend against the robbery charge as well, because if he was innocent, he would not fear the testimony of the deceased. But a motive to kill could be found whether defendant was guilty or innocent of the robbery. In any event, that defendant might think it fit to offer proof as to his non-involvement in the robbery (he points to no such offer of evidence by him and we recall none), does not bear upon the competency of the evidence admitted against him. Nor is the evidence inadmissible because it could show a like motive to kill in the other defendants to the robbery indictment. That others too might have had the same reason to dispose of Scannella goes only to the weight of that proof in the context of the total case against defendant.

## III.

██ As mentioned above, there was expert testimony comparing soil taken from the automobile with soil from the dirt road leading to the spot where the body was found. There

was also expert testimony that the hair particles on the comb found near the body could not have come from the deceased and were of a general category within which defendant's hair would fall.

Defendant says this testimony was too speculative and hence inadmissible. We think the evidence was competent. How much it was worth, was for the jury to say.

## IV.

To meet the State's claim that defendant killed Scannella because defendant knew Scannella planned to testify for the State in the armed robbery trial, defendant sought to negate such a motive by showing their relationship was cordial. To that end, defendant offered evidence that he was with deceased at the bar and restaurant in Trenton and the club at Langhorne and that their mood was friendly. All of that evidence was accepted without challenge.

Still on the same theme, i. e., to dispel the existence of a motive to kill, defendant sought to prove that the deceased asked him to help him obtain a new lawyer for the impending robbery trial. The defense apparently wanted to argue from such proof that Scannella must have changed his mind about testifying for the State, although there was no offer to prove Scannella said he had changed his mind and of course a change of counsel would not necessarily mean that he had.

The trial court drew a line between what happened before the homicide, which the court held admissible, and what happened thereafter, which the court held could not be proved. Thus Peggy Mason, with whom defendant lived, was permitted to testify that on Friday, October 2, the deceased came to their home and told defendant that his (deceased's) attorney "had dropped him" and "he wanted Dave [defendant] to find, help him find a lawyer." But the trial court would not permit the witness to say that at 9:30 the next morning, which was after the homicide but before the body

was found, defendant asked her whether the deceased had arrived and told her to wake him when the deceased did come because they had an appointment that morning with Jack Di Nola, Esq., a member of the bar. Mr. Di Nola was produced, and it was developed, in the absence of the jury, that defendant telephoned him on October 1, saying a friend, with a "Latin" name which Di Nola could not recall, "was to appear in Court on a Monday and they were dissatisfied with the Counsel that they had at that time, and he asked me to interview this friend on Saturday, the 3rd." Defense counsel represented that Di Nola would testify that on Saturday defendant called again and said his friend had not arrived, and that the appointment was moved to the following day. When the trial court ruled Di Nola could testify only with respect to conversations before the homicide, the defense chose to withdraw him and to forego proving before the jury even what the trial court would allow, *i. e.,* the telephone conversation before the murder.

We should stress that the problem before us is one of "hearsay" testimony. As stated in 6 *Wigmore, Evidence* (*3d ed.* 1940), § 1766, *p.* 177:

"The theory of the Hearsay rule * * * is that, when a human utterance is offered as evidence of the truth of the fact asserted in it, the credit of the assertor becomes the basis of our inference, and therefore the assertion can be received only when made upon the stand, subject to the test of cross-examination. If, therefore, an extrajudicial utterance is offered, not as an assertion to evidence the matter asserted, but *without reference to the truth of the matter asserted*, the Hearsay rule does not apply. The utterance is then merely not obnoxious to that rule. It may or may not be received, according as it has any relevancy in the case; but if it is not received, this is in no way due to the Hearsay rule."

Here the conversations defendant had with Mrs. Mason and Mr. Di Nola on Saturday morning were offered for the truth of the assertion by defendant which defendant says the conversations implicitly contained, to wit, that he and Scannella were friends, that he had no fear that Scannella would testify for the State and indeed Scannella told him he did not intend

so to testify and for that reason wanted another lawyer. Although the defense thus limited the offer of proof to the subject of "motive," the offer could also carry still another assertion by defendant, to wit, that he believed Scannella was then alive. Upon either view, the content of defendant's communications could have no impact in the case except in terms of their truthfulness. Thus we are not dealing with so-called "verbal acts" which "enter irrespective of the truth of any assertion they may contain" and which "neither profit nor suffer by virtue thereof." 6 *Wigmore, Evidence* (3d ed. 1940), § 1772, *p.* 191.

As we have said, the trial court thought that statements made by defendant before the homicide were probative as to an issue in the case, *i. e.,* defendant's then state of mind, but that what defendant did or said after the shooting was of another character. Our cases do draw such a line. Declarations by the victim of the crime, or by the accused prior to the criminal event, are admitted notwithstanding their "hearsay" character. Generally the basis for accepting such testimony is that the behavior of both the victim and the defendant are part of the mosaic of the criminal event, and hence, insofar as their declarations bear upon either the quality of their acts or a relevant state of mind, they must be accepted as part and parcel of the critical scene. As to statements by the deceased, see *State v. Thornton,* 38 *N. J.* 380, 389 (1962), *cert.* denied 374 *U. S.* 816, 83 *S. Ct.* 1710, 10 *L. Ed.* 2d 1039 (1963); *State v. Lang,* 108 *N. J. L.* 98, 102 (*E. & A.* 1931); *Hunter v. State,* 40 *N. J. L.* 495, 536–540 (*E. & A.* 1878); and as to statements of a defendant prior to the crime, see *State v. Kane,* 77 *N. J. L.* 244 (*Sup. Ct.* 1909).

Statements made by an accused after the criminal event present a different problem. Whereas his declaration prior to or at the time of the event may be an integral part of the criminal scene (*i. e.,* bearing upon the quality of his act or his intent or motive), his conduct and state of mind after the criminal event are ordinarily not in themselves triable issues in the case. Nonetheless Wigmore suggests in broad terms

that a defendant's statements after the act with respect to past intent or motive should be provable on his behalf, and also that "subsequent statements predicating a *then existing* state of mind" should also be admissible in his favor to evidence his prior state of mind. 6 *Wigmore, Evidence* (*3d ed.* 1940), § 1732, *pp.* 103–104. The proposed Uniform Rules of Evidence would not go that far.[1]

The scene is so vast that it would be unwise to attempt to state a rule to control all cases. At one extreme would be an offer to prove through another a defendant's detailed denial of his guilt made after he was charged. We do not recognize a right of a defendant to make an unsworn statement even in court, and we would not permit someone to relate for him his out-of-court account of what happened. And so we have said that the version of the criminal event a defendant gives a psychiatrist retained by him for the purpose of trial cannot be considered as substantive evidence of defendant's role in the criminal event where the defendant does not take the stand and submit himself to examination under oath with respect to that account. *State v. Whitlow,* 45 *N. J.* 3, 19–20 (1965). Other cases in our State have rejected a defendant's offer of proof of an expression of affection for his wife made after she was murdered. *State v. Leo,* 80 *N. J. L.* 21 (*Sup. Ct.* 1910); *State v. Cerce,* 22 *N. J.* 236, 247 (1956).

In the cases just cited, the defendant's out-of-court declaration was made after defendant indisputably knew the victim was dead. In some situations in which such knowledge is in dispute, it may be necessary for a defendant to prove his

---

[1] Rule 63(12) reads:

"Unless the judge finds it was made in bad faith, a statement of the declarant's (a) then existing state of mind, emotion or physical sensation, including statements of intent, plan, motive, design, mental feeling, pain and bodily health, but not including memory or belief to prove the fact remembered or believed, *when such a mental or physical condition is in issue or is relevant to prove or explain acts or conduct of the declarant,* or (b) previous symptoms, pain or physical sensation, made to a physician consulted for treatment or for diagnosis with a view to treatment, and relevant to an issue of declarant's bodily condition;" (emphasis added)

conduct in order to meet a thrust in the State's case. For example, if the State's case showed the defendant was to see the deceased the day after the homicide, a failure to show the defendant tried to keep the appointment might lead the jury to assume he did not try and hence must have been the slayer. So, in the case before us, if the State's evidence showed that defendant was to meet with the deceased and the attorney on Saturday morning, the defense would plainly have been entitled to prove defendant told the attorney on Saturday morning that the deceased had not appeared. It will be recalled the defense here did not prove an appointment had been made, having decided not to do so when the trial court ruled the attorney could not then testify to a telephone call from defendant on Saturday morning. We add that the defense did not suggest that if the appointment were proved, defendant should be permitted to prove the telephone call on Saturday morning for the reason we have just suggested. Rather the sole reason for the total offer was to disprove the motive the State claimed.

 The difficulty does not repose in the self-serving aspect of a defendant's declarations concerning his state of mind. Of course a party's testimony is self-serving, but he being competent to testify, his interest in the outcome bears only upon the value of what he says and not its competency. See *State v. Abbott,* 36 *N. J.* 63, 79 (1961); *cf. United States v. Matot,* 146 *F. 2d* 197, 198 (2 *Cir.* 1944); *United States v. Bucur,* 194 *F. 2d* 297, 301 (7 *Cir.* 1952). Rather the difficulty lies elsewhere. If the defendant does not himself testify to the extrajudicial statement, the difficulty is in the hearsay quality of the declaration, and if the defendant does testify to the declaration and thus expose himself to cross-examination, the difficulty may then be that proof of such extrajudicial declarations may be of so little probative value, in the light of the motive to fabricate, that it is not worthwhile to try out the question whether such extrajudicial declarations did occur and whether, if they did, they were feigned.

In the case before us, the declarations were made before the body of Scannella was found, and hence there was no incontestible proof of a reason to fabricate. Whether defendant knew of the murder depended, as the record stands, upon his guilt. Thus the question is whether extrajudicial declarations made by an accused before his knowledge of the crime is indisputably shown, should be admitted. If the defendant himself sought thus to testify, we think his testimony would be receivable. The complication here is that defendant did not attempt so to testify, but rather sought to prove his extrajudicial assertion through the lips of third persons who of course could not be cross-examined with respect to the truth of what defendant asserted to them. In this connection it seems appropriate to refer to proposed Rule 63 (1) of the Uniform Rules of Evidence which would admit:

"A statement previously made by a person who is present at the hearing and available for cross examination with respect to the statement and its subject matter, provided the statement would be admissible if made by declarant while testifying as a witness."

The proposed rule of course contemplates that the declarant be present and subject to call for cross-examination. A defendant in a criminal case is beyond that call. Further, if a declaration is received without the testimony of the defendant, there may arise a sticky question as to whether the prosecution, in assailing the probative value of the extrajudicial declaration, may point to the failure of the defendant to take the stand in support of it.

Nonetheless, on balancing the foregoing considerations, we think the offer of testimony of Peggy Mason and the attorney should have been accepted for whatever it might be worth. But on the facts of this case we cannot find the court's ruling was harmful. Whether the offer be considered in the light of its stated purpose, *i. e.*, to meet the charge of motive to kill or to show, as we have suggested, an innocent state of mind at a time after death but before the body was found, this testimony would have been a negligible contribu-

tion to this case. There was extensive testimony, both in the State's case and in the defense, that defendant and deceased were together for many hours in an apparent friendly mood. The issue squarely before the jury was whether defendant's behavior was a pretense to cover the traces of a plan to kill then in execution. The same question would attend any evidence that defendant behaved on Saturday morning as if he thought defendant was still alive. Such further testimony could not aid in the resolution of the question whether defendant was the cunning, calculating killer the State claimed he was. Even if defendant had sworn to all of this, the solution of that issue would be little advanced, and without his testimony, the contribution would be minuscule. Indeed it could have served only to emphasize his failure to take the stand whether or not the prosecution could have made a point of that failure.

## V.

As mentioned above, defendant lived with Peggy Mason who testified for him. On cross-examination the prosecutor brought out that she had four children, and then asked, "Is David Baldwin the father of any of —." There was an objection and motion for a mistrial. The motion was denied, but the objection was sustained and the jury was instructed to disregard the question and its import.

Defendant complains that the inquiry into his illicit relationship with Peggy Mason improperly imputed to him guilt of another, irrelevant crime, citing *State v. Marchand,* 31 *N. J.* 223 (1959).

There are a number of reasons why defendant's complaint is without substance. First, defendant himself put Mrs. Mason on the stand and drew from her testimony that they were living together. That a child emerged from that relationship added little to its illicit character. Second, that relationship, and the fact that defendant was the father of

her child,[2] showed the witness had an interest in the trial which was relevant upon the subject of her credibility. Hence the trial court could properly have overruled the objection, although its ruling in favor of the defense was no doubt an appropriate exercise of discretion. Third, a mistrial was not necessary in any event. It was well within the trial court's discretion to instruct the jury and continue the trial.

## VI.

Defendant contends his motion for a direction of a verdict should have been granted and alternatively that the verdict is against the weight of the evidence. We set forth the evidence at some length at the outset of this opinion. We are satisfied the evidence was ample; nothing would be gained by saying more.

## VII.

The final question is whether the trial court erred in denying a motion for a new trial based upon the recantation by Cordine of his testimony at the trial. It will be recalled that his testimony at the trial did not include a direct admission of guilt but rather inculpated defendant inferentially by attributing to him two statements. The first, made in response to a suggestion by Cordine that he might try to plead to murder in the second degree, was:

"Well, it is their burden to prove beyond reasonable doubt that I did kill this man. * * * right now I feel no immediate danger, but in the event that they ever should get warm, why, I just might ask for that if they would permit me."

The second statement attributed by Cordine to defendant was:

---

[2] That defendant was the father of her child is not disputed. Defendant's counsel had obtained an order from the trial court to permit her to visit defendant in jail on the basis of that relationship.

"That it happened to be my luck that it was the first day of bow and arrow season that they discovered the body."

Recantations by fellow prisoners are not uncommon. It would be unwise to vest in a State's witness the effective power thereby to grant a new trial. Recantations are inherently suspect. And the issue for the trial court upon the application for a new trial is not whether the new story, had it been available at trial, would have impugned the credibility of the witness, for obviously a different story under oath must have that effect, but rather the question is whether the testimony given at the trial was probably false and that on that account there is a substantial possibility of miscarriage of justice. Thus the trial judge must himself consider where the truth probably lies, and if the trial court is satisfied the present testimony of the recanting witness is unbelievable, the application must be denied. *State v. Puchalski*, 45 *N. J.* 97, 107–108 (1965). Here the trial court found that Cordine's new testimony could not be credited. That view is amply sustained by the record.

Cordine met defendant at the county jail where defendant was awaiting trial on this murder charge and Cordine was held on a charge of assault and battery. Cordine, a veteran of sundry encounters with the law, was also then under sentence or about to be sentenced for an offense in Somerset County. Cordine was transferred to the Vroom Building because of an emotional or mental problem, and the prosecutor, learning, in some way not revealed in the record, that defendant had talked with Cordine about the case, approached Cordine and sought his aid. At first Cordine declined. Later he revealed what we have already mentioned. Cordine was then placed near defendant to learn more. Defendant allegedly thereafter made other statements much more incriminating, which however were suppressed before trial upon the basis of *Massiah v. United States*, 377 *U. S.* 201, 84 *S. Ct.* 1199, 12 *L. Ed. 2d* 246 (1964).

Upon the motion for new trial, Cordine said the prosecution formulated the statements he made and that the inducement was a promise to have him relieved of the Somerset County sentence. As the trial court noted, the statements suppressed were the more damaging and hence, if there were fabrication by the prosecution, Cordine would have attributed the more damaging ones to the period before the prosecutor first interviewed him. Moreover, a letter written by Cordine to the assistant prosecutor from the penitentiary after the main trial refutes the promise asserted on the motion for a new trial, because the letter speaks only of a promise of help to the end that the Somerset sentence would be served elsewhere than at State's Prison where Cordine might suffer revenge at the hands of defendant's friends. That claim accords with the testimony of the assistant prosecutor that he said he would do what he could to guard Cordine against retaliation, a promise which would in no way invite Cordine to fabricate a story against the defendant.

Further, it was developed that defendant indeed did take to Cordine in a way that might otherwise seem unbelievable. The State produced two writings from defendant to Cordine. One, couched in what was supposed to be "code," would inform an important inmate at State's Prison that Cordine was a friend of defendant and hence to be treated with consideration. The second relates how, with respect to a robbery charge, a policeman misstated the hour of the crime, to the delight and advantage of defendant. That writing plainly reveals defendant's guilt of the robbery and thus indicates a disposition to confide in Cordine, despite the newness of their friendship.

The total record well supports the trial court's finding that Cordine's testimony on the motion for a new trial is unworthy of belief and does not warrant a new trial.

The judgment of conviction and the order denying the motion for a new trial are affirmed.

402

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For reversal*—None.