277 N.J. Super. 311 (1994)
649 A.2d 879
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
CHRISTOPHER CRUMB, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued September 14, 1994.
Decided November 22, 1994.
*312 Before Judges KING, D'ANNUNZIO and EICHEN.
Jack J. Lipari, Assistant County Prosecutor, argued the cause for appellant (Jeffrey S. Blitz, Atlantic County Prosecutor, attorney; Mr. Lipari, of counsel and on the letter brief).
*313 Barbara J. Lieberman argued the cause for respondent (Ms. Lieberman on the brief).
The opinion of the court was delivered by D'ANNUNZIO, J.A.D.
Atlantic County Indictment No. 93-09-2265 charged defendant with the murder of Roy Dick, a 75 year old black man, in violation of N.J.S.A. 2C:11-3a(1) and (2), and with possession of a weapon, a walking cane, with a purpose to use it unlawfully against the person or property of another, in violation of N.J.S.A. 2C:39-4d. A superseding indictment, No. 94-03-0669, added as a third count the charge that defendant assaulted Roy Dick and in doing so he was motivated "at least in part, with ill will, hatred or bias toward and with a purpose to intimidate Roy Dick because of race," in violation of N.J.S.A. 2C:12-1e.
We granted leave to the State to appeal from a pre-trial order severing count three of the superseding indictment and excluding from "the State's case in chief" drawings and writings allegedly prepared by defendant, expressing defendant's hatred of blacks and his dedication to "white supremacy."
The record indicates that the State has evidence tending to prove the following facts. The victim, Roy Dick, died on July 19, 1993, while a patient at the Atlantic City Medical Center, from injuries he sustained on July 13, 1993. On the latter date, persons living on South Chelsea Avenue in Atlantic City heard loud noises and observed a blond male jump into a gray, 1980's vintage automobile, either a Chevrolet or a K-car. The car was operated by a blond female and exited the Chelsea Pub parking lot. Apparently, the witnesses also observed Dick's body because the police and an ambulance responded to the scene. Dick, who used two canes to assist him in walking, had multiple injuries caused by blunt force trauma and was unconscious when he was removed from the scene. Dick's wallet was in his pocket and contained approximately $127 cash.
*314 On July 16, 1993, as a result of information provided to law enforcement authorities, the police questioned defendant and one Tabitha Buntele. They were apprehended in a gray 1987 Plymouth Reliant K-car owned by Buntele's mother.
Buntele told the police that she saw Crumb push a black male while Crumb was going through the bushes behind the Chelsea Pub parking lot. Buntele stated that thereafter she was unable to see defendant or the victim. According to Buntele, when Crumb returned to her car, he said that he had hit the man, and later he admitted to having kicked the man.
Crumb told the police he had been drinking that night and was urinating in the bushes in back of the Chelsea Pub parking lot when an old man with dark skin approached and swung a cane at him. Crumb was not struck, but he stated that he grabbed the cane and hit the man in the face with his fist. Defendant told the police that he possibly hit the man in the face a second time. According to defendant, the man fell down but did not get up. Crumb then left the scene with Buntele. Police charged Crumb with aggravated assault, and he was incarcerated.
The charge was amended to murder when Roy Dick died. Upon being informed of the new charges, defendant allegedly admitted that he had perhaps struck the victim more than twice. He advised the police that Tabitha Buntele had not been involved in the assault.
The State also contends that a witness, William Dayton, informed the police that he had heard defendant state he had beaten up "an old black bum." According to Dayton, Crumb said that he had walked past the victim and struck him in the back of the head, and that once the victim was on the ground, he had kicked and stomped on his face and chest. Crumb told Dayton that he did it "just because he was there" and that Tabitha Buntele was urging him on.
The State also alleges that Crumb told a fellow inmate, Arthur Thomas, a black man, that he is a skinhead and that skinheads *315 don't like people of another color or "anyone who looks like a scum." According to Thomas, Crumb said that he took the cane from the victim and beat the victim over the head with it, that once the victim was on the ground he kicked and punched him and that Tabitha Buntele also kicked the victim.
According to the State, the defendant made a telephone call to Christine Frolich. Crumb told Frolich that he had been looking for black bums to kill and that he kicked and stomped the victim and that Buntele helped him by kicking the victim in the stomach.
An autopsy revealed the cause of Roy Dick's death to be blunt force trauma to the face, head, upper extremities and thorax. The medical examiner found symmetrical fractures to the victim's orbits, which were consistent with being struck by the cane. The victim had fractures of his sternum and the second, third, fourth and fifth ribs on the left side. According to the State's theory, those injuries are consistent with being kicked or stomped.
The State seized the written material, which is at the core of this appeal, in February 1993, five months before Roy Dick's death. It was seized during execution of a warrant to search defendant's apartment in connection with another criminal investigation. The material consists of letters, verse and drawings. In one letter to someone named Shawna, defendant stated that "I'm a Dedicated Atlantic City Skinhead. I've Got the Shaven head, the Black Bomber Jacket, the Dr. Martens Combat boots, the Red Suspenders And 13 different Tattoos. But I'm still a loyal Satanist."
The drawings refer to skinheads, and A.C.S. (Atlantic City Skinheads). They also contain phrases, such as "White Power," "Sieg Heil," "Nazi Skinheads" and "Neo Nazi." The swastika decorates many of the papers.
Of direct relevance to this case are references to black people. One 8-1/2" X 11" sheet contains two phrases in ultra large lettering: "Die Nigger Scum" and "White is Right." Another sheet contains the phrase "Nazi Pretty Boys" above a swastika located in the *316 center of the page. The bottom of the page contains a hand-drawn circle within which is written "Kill them Fucking Niggers." Beneath the circle is the phrase "White Power."
Other writings express admiration of Adolf Hitler's racial policies and refer favorably to the Ku Klux Klan. One note referring to Hitler states: "His Attitude Toward the Minorities and Jews was about the same I would have done if I had the power."
The State filed a pre-trial motion for a ruling regarding the admissibility of the written material at trial. Defendant opposed the application and cross-moved for an order dismissing the third count or severing it for a separate trial. The trial court ruled that the material seized during the search of defendant's room (hereinafter written material) would not be admitted at trial in the State's direct case. The court determined that the written material was too inflammatory and that the resulting prejudice to defendant outweighed its probative value regarding defendant's motive. The court noted that defendant's statements to persons such as Frolich and Thomas regarding his racial motivation would be admissible because those statements related directly to the Roy Dick homicide.
Recognizing that the written material would be admissible in prosecuting the bias crime, the court severed the third count for a separate trial, but denied defendant's motion to dismiss it.
As previously indicated, the trial court excluded the written material because it determined that the risk of undue prejudice substantially outweighed the written material's probative value. See N.J.R.E. 403. That is a determination left to the sound discretion of the trial court and we may not interfere with the court's ruling "unless it can be shown that the trial court palpably abused its discretion, that is, that its finding was so wide of the mark that a manifest denial of justice resulted." State v. Carter, 91 N.J. 86, 106, 449 A.2d 1280 (1982). We are persuaded that the court erred.
*317 A wider range of evidence is admissible to establish motive or intent than is permitted in support of other issues. State v. Rogers, 19 N.J. 218, 228, 116 A.2d 37 (1955). "Otherwise there would often be no means to reach and disclose the secret design or purpose of the act charged in which the very gist of the offense may consist.... All evidentiary circumstances which are relevant to or tend to shed light on the motive or intent of the defendant or which tend fairly to explain his actions are admissible in evidence against him although they may have occurred previous to the commission of the offense." Ibid. (citations omitted); accord State v. Carter, supra, 91 N.J. at 106, 449 A.2d 1280. Evidence establishing motive is so essential that it is admissible as an exception to N.J.R.E. 404(b), which generally excludes evidence "of other crimes, wrongs or acts" to prove a defendant's disposition to behave in a particular way. Cf. State v. Baldwin, 47 N.J. 379, 391, 221 A.2d 199, cert. denied, 385 U.S. 980, 87 S.Ct. 527, 17 L.Ed.2d 442 (1966) (in murder trial, evidence that victim intended to testify against defendant regarding an unrelated robbery was admissible to establish defendant's motive); State v. Engel, 249 N.J. Super. 336, 372-74, 592 A.2d 572 (App.Div.), certif. denied, 130 N.J. 393, 614 A.2d 616 (1991) (murder defendant's prior violent treatment of and threats to former wife, the victim, were admissible to establish motive).
In the present case, some of the written material directly expresses defendant's hostility toward and hatred of black people and his concomitant desire to see them dead. This material is compellingly powerful evidence of a motive which helps to explain an otherwise inexplicable act of random violence. The material also tends to cast doubt on the credibility of defendant's self-serving statement that Roy Dick initiated the confrontation by swinging his cane at Crumb. Moreover, in his statements to the police, defendant said that he had returned to the scene at 8:00 a.m. the morning of the incident, implying a concern regarding the victim's well being. The written material belies that suggestion.
*318 The indictment charges defendant with "purposely or knowingly" causing Roy Dick's death. The State must prove those elements of culpability beyond a reasonable doubt. N.J.S.A. 2C:1-13a; N.J.S.A. 2C:2-2a and b(1) and (2). The written material has substantial probative value regarding defendant's state of mind. Without it, a jury would not know the context of Roy Dick's death and might be resistant to the idea that a young man purposely would inflict deadly harm on an elderly stranger without any apparent reason such as theft or substantial provocation. The written material tends to supply the reason.
At trial, defendant may be entitled to a jury instruction regarding lesser included offenses such as aggravated manslaughter, N.J.S.A. 2C:11-4a, and reckless manslaughter, N.J.S.A. 2C:11-4b(1). See N.J.S.A. 2C:1-8e; State v. Crisantos, 102 N.J. 265, 278, 508 A.2d 167 (1986) (rational basis test provides a low threshold for charging lesser included offenses). The written material has substantial probative value to the State in establishing that defendant acted with the necessary culpability, i.e., "extreme indifference to human life" that distinguishes aggravated manslaughter from reckless manslaughter.
In one of his statements to the police, defendant alleged that he defended himself against a cane attack initiated by Roy Dick. The written material is relevant to the issue of self defense. N.J.S.A. 2C:3-4 provides that the "use of deadly force is not justifiable ... unless the actor reasonably believes that such force is necessary to protect himself against death or serious bodily harm." If the jury believes that Dick attacked defendant but that defendant responded with deadly force, it would have to decide whether Crumb reasonably believed deadly force was necessary or whether Crumb took undue advantage of the situation to act out the racial philosophy expressed in his writings. See State v. Bowens, 108 N.J. 622, 532 A.2d 215 (1987). Of course, the written material is also relevant to Crumb's credibility regarding the need to defend himself, and to meet any claim of imperfect self-defense. Id. at 633-34, 532 A.2d 215.
*319 The written material also corroborates the anticipated testimony of Frolich and Thomas regarding defendant's race-related statements to them.
Evidence of substantial probative value may be excluded if its potential for prejudice exceeds its probative value. We recognize that the written material is potentially inflammatory. Nevertheless, we conclude that Crumb's race hatred as expressed in the written material is central to the case.
State v. Carter, supra, involved the killing of a white bartender and several bar patrons, also white, by two black men. The State introduced evidence in support of its theory that they were killed in revenge for the killing of a black man at a tavern several hours earlier. The Supreme Court rejected defendant's contention that the evidence was unduly prejudicial and inflammatory, ruling that it was for the jury to decide whether defendants' relationship with the family of the murdered black man "could impel them to retaliate for one murder by randomly killing others." State v. Carter, supra, 91 N.J. at 106, 449 A.2d 1280. The Court also rejected defendant's claim of undue prejudice:
The defendants claim that irrespective of the relevance of the motive evidence, its impact was so inflammatory that the jury was improperly swayed in its deliberations. However, `evidence as to motive is admissible even though it may be prejudicial in the sense that it will arouse or inflame the jury against the defendant.' 1 Wharton, Criminal Evidence, supra, § 170, at 316. There is nothing inherently wrong with advancing a theory of revenge as a motive for murder, if the facts bear out the theory.
[Ibid.] Cf. Barclay v. Florida, 463 U.S. 939, 949, 103 S.Ct. 3418, 3424, 77 L.Ed.2d 1134, 1143-44, reh'g denied, 464 U.S. 874, 104 S.Ct. 209, 78 L.Ed.2d 185 (1983) (in imposing the death penalty, the trial judge did not violate the Constitution by taking into account the role of race hatred in the murders).
United States v. Mills, 704 F.2d 1553 (11th Cir.1983), cert. denied, 467 U.S. 1243, 104 S.Ct. 3517, 82 L.Ed.2d 825 (1984), concerned a prosecution arising out of the murder of an inmate in a federal prison. Defendant was a fellow inmate who was a member of a gang of white prisoners known as the Aryan Brotherhood. *320 The government contended that the murder was retribution for some wrong perpetrated by the victim on a brotherhood member in another prison. Defendant was convicted, and on appeal contended that the evidence "on the organization, history, and activities of the Aryan Brotherhood, and ... a letter he wrote ... which alluded to previous crimes and described Aryan Brotherhood activities" should have been excluded under Fed.R.Evid. 404(b) as evidence of other crimes, wrongs or acts and also should have been excluded under Fed.R.Evid. 403 as unduly prejudicial. Id. at 1558-59. The Court of Appeals rejected those arguments, ruling the evidence "pertained to a chain of events forming the context, nature and set-up of the crime," and that the evidence was necessary "[t]o make the crime comprehensible to a jury." Id. at 1559.
We are persuaded, based on the limited record developed below, that the probative value of the written material expressing defendant's death wish for black people is not outweighed by risk of undue prejudice, and the court should not have ordered it excluded on the State's direct case. We see nothing unfairly prejudicial in utilizing defendant's written statements to establish his state of mind, a necessary element in this prosecution, as we previously explained.
Regarding the written material which does not expressly mention black people, we conclude that the trial court should not have excluded it in a pre-trial ruling. Rather, the court should have awaited its offer during the context of the trial. Although this material does not mention black people, it does have probative value in establishing defendant's commitment as a "skinhead" to racial confrontation and his adherence to theories of racial supremacy. Thus, it tends to reinforce and give context to defendant's expressions of hostility toward blacks, and would rebut any expressed or implied suggestion that the written material referring to blacks was an isolated aberration. If this other material is offered in the State's direct case, the trial court will have to evaluate its probative value and the risk of undue prejudice under *321 N.J.R.E. 403, in the circumstances of the case as they evolve at trial. We suggest that reserving its admission for rebuttal may be an inappropriate compromise, because there will be no opportunity for rebuttal if the defendant presents no evidence.
We express some caution regarding our ruling that the material regarding black people is admissible. Pre-trial motions on evidence issues should be granted only sparingly. Bellardini v. Krikorian, 222 N.J. Super. 457, 464, 537 A.2d 700 (App.Div. 1988). The record developed at trial may differ from the record developed below on the parties' motions, perhaps substantially. The trial judge, therefore, must be sensitive to any significant differences between the record on this appeal and what occurs at trial and the impact of those differences on issues of relevance and undue prejudice, even with regard to the material calling for the deaths of blacks. It goes without saying, of course, that the trial judge must rule on foundation issues, such as chain of custody and whether the State adequately connects the written material with defendant in such a way that a jury can infer that the material expressed defendant's attitude and state of mind.
We affirm that part of the order severing the third count. We do so out of an excess of caution. Trying the bias count with the murder count may compel the admission of some of the written material which the court otherwise would exclude. The bias count, a fourth degree offense, may, if tried with the other counts, skew decisions regarding the admission of evidence. We perceive little cost to judicial efficiency resulting from severance. If defendant is convicted of a homicide offense, it is unlikely that the State will proceed on the third count.
Moreover, we have substantial reservations regarding the applicability of the third count in this case. The third count is based on N.J.S.A. 2C:12-1e. It provides that "[a] person who commits a simple assault as defined in subsection a of this section is guilty of a crime of the fourth degree if the person acted, at least in part, with ill will, hatred or bias ... because of race...." (emphasis added). On its face, this statute is limited only to persons *322 convicted of simple assault under N.J.S.A. 2C:12-1a and would not be applicable to persons convicted of more serious assaultive behavior. If Crumb is convicted of anything, it is likely to be of a greater offense than simple assault.
That part of the order excluding the written material is reversed. The order severing the third count is affirmed. The case is remanded to the trial court for further proceedings.