734 A.2d 1147

ROBERT GREEN AND IRENE GREEN, HIS WIFE, PLAINTIFFS–APPELLANTS, v. NEW JERSEY MANUFACTURERS INSURANCE COMPANY, DEFENDANT–RESPONDENT.

ROBERT GREEN AND IRENE GREEN, HIS WIFE, PLAINTIFFS–APPELLANTS, v. DEBORAH A. DREYER AND ON TIME TRANSPORT, INC., A NEW JERSEY CORPORATION, DEFENDANTS, AND IRONBOUND HEAT TREATING CO., A NEW JERSEY CORPORATION AND HAROLD A. WILLIAMS, DEFENDANTS–RESPONDENTS.

Argued March 30, 1999—Decided July 29, 1999.

481

482

*Andrew J. Kyreakakis* argued the cause for appellants (*Ambrosio, Kyreakakis, DiLorenzo, Moraff & McKenna,* attorneys).

*Brian G. Steller* argued the cause for respondent New Jersey Manufacturers Insurance Company (*Connell Foley & Geiser,* attorneys; *Glenn T. Dyer,* on the brief)

*Edwin J. McCreedy* argued the cause for respondents Ironbound Heat Treating Co. and Harold A. Williams (*McCreedy & Cox,* attorneys).

The opinion of the Court was delivered by

HANDLER, J.

This consolidated case is based on personal injury claims arising out of two motor vehicle accidents. In the course of the trial, the court allowed defendants to introduce evidence of the plaintiff's racial bias. That evidence consisted of the plaintiff's deposition testimony, which was used to impeach him on cross-examination. The jury returned a verdict of no cause against plaintiff, and the Appellate Division, in an unreported decision, affirmed the jury verdict. The matter is before the Court based on a dissent. *Rule* 2:2–1(a).

The dissent would have reversed the jury verdict and remanded for a new trial because the admission of the plaintiff's racist remarks was unduly prejudicial and had the clear capacity to infect the jury's verdict, pursuant to *N.J.R.E.* 403. The position of the dissent concerning the evidence of the plaintiff's racial bias poses the issue on appeal.

I

On the night of August 6, 1991, plaintiff, Robert Green, a high-voltage electrician, was on his way to a night shift when his van was struck by a car and pushed into a signal pole. The van was completely destroyed. Green refused to go to a hospital believing that he had suffered only minor injuries. He completed his entire work shift from twelve midnight to seven o'clock the next morning.

The next day, plaintiff went to a care station complaining of chest pains. He was diagnosed with a broken rib and later experienced pain in his elbow. On September 27, 1991, after consulting with two physicians, Green stopped going to work. As of the trial date, he had not returned to work.

Plaintiff's second accident occurred on the afternoon of January 19, 1994, as Green was being driven home by a medical transport vehicle from an appointment with his psychologist. Plaintiff was unable to drive because of neck problems. The "On Time Transport" vehicle had stopped at a stop sign when it was struck from the rear by a van, causing it to skid into the middle of the road. Plaintiff asserted that when the transport vehicle was struck, he jammed his wrists against the dashboard to keep from hitting the windshield and was then slammed back into his seat by the shoulder belt. Green was taken to the hospital, where he was prescribed pain medication and released with instructions to consult his doctor.

Plaintiff received a settlement for damages incurred in the 1991 accident based on the other driver's policy limit of $100,000. He then pursued an underinsured motorist's action (UIM) against his carrier, defendant New Jersey Manufacturer's Insurance Company (NJM), for alleged damages in excess of $100,000. A binding arbitration of that action resulted in a liability finding of 85% negligence against the alleged tortfeasor and 15% negligence on the part of the plaintiff and an award for damages. NJM filed an action for de novo review on the issue of damages. Plaintiff also sued NJM, his Personal Injury Protection (PIP) carrier, for

unreimbursed medical expenses, allegedly incurred as a result of the 1991 accident.

After the 1994 accident, plaintiff brought an unrelated personal injury action against On Time Transport and its driver, Deborah Dreyer; defendant Harold Williams, who was driving a van owned by defendant Ironbound Heat Treating Company; and NJM, Ironbound's insurance carrier. On Time Transport and Deborah Dreyer settled with plaintiff before trial.

The actions against NJM for UIM coverage for the 1991 accident and against defendants Ironbound and Williams (hereinafter "Ironbound") for the 1994 accident were consolidated and tried together by a jury. The PIP action was reserved for the trial court's determination.

## A.

The issue before the Court involving the admission and import of plaintiff's racist statements must be considered in the context of the extensive medical evidence detailing plaintiff's injuries.

The medical experts at trial addressed Green's physical symptoms and their origins, focusing particularly on his chronic pain. Green testified that he suffered numerous symptoms as a result of the 1991 accident, including chronic pain in his neck, arms and legs, as well as numbness in his hands. He began to experience lower back pain after the 1994 accident, and he ultimately had three surgeries performed: a nerve release on the right arm performed by Dr. Hodosh; a discectomy and left arm nerve release performed by Dr. Koziol; and the insertion of a spinal cord stimulator performed by Dr. Kantha. Green testified, however, that none of the surgical procedures was successful in significantly alleviating his chronic pain.

Green also related a number of physical injuries prior to the 1991 automobile accident. He denied missing any substantial amount of work for those injuries, but admitted on cross-examination to other past injuries that required him to miss work for

several weeks at a time. Plaintiff's treating physician in the 1980's testified to his treatment of Green and that he referred Green to an orthopedic surgeon, a neurologist, and two neurosurgeons.

Four other medical experts testified on behalf of Green. These experts found that Green's injuries, including his neck, back, elbow, and nerve injuries, were permanent and had been caused by the 1991 accident. They testified that Green's condition worsened following the 1994 accident and that he experienced lower back pain, carpal tunnel syndrome, and shoulder instability as a result. The experts conceded, however, that Green had complained of some symptoms, including numbness in the arms, as early as 1983.

Green also claimed that he suffered psychological injuries as a result of the two car accidents. He presented evidence regarding his symptoms, including a diagnosis of Post Traumatic Stress Disorder (PTSD),[1] which he claimed was a result of the trauma he suffered in the 1991 accident. Defendants contended, however, that plaintiff's PTSD was the result of trauma Green suffered while serving in Vietnam, and that it was compounded by other, preexisting psychological conditions, including paranoia.

Plaintiff initially testified that he had had no stressful personal events in his life prior to the 1991 accident. He stated that it was only after the accident that he began experiencing psychological symptoms, including depression and anxiety, which required psychological and psychiatric treatment. He conceded on cross-examination, however, that his two marriages had ended in divorce and that he had a child with whom he was no longer in contact.

Green also admitted to participating in a group therapy or "rap group" for Vietnam veterans in 1991 at his doctor's recommendation when he experienced flashbacks of his Vietnam experience

---

[1] According to the expert testimony of Dr. Layman, Green's treating psychiatrist, PTSD is "an anxiety disorder which develops when a patient is exposed to a severe stress under certain conditions."

during the Persian Gulf War. He denied, however, having received any specific treatment or medication at the Veterans' Administration (VA) Hospital for psychological problems related to Vietnam. Green's physician contradicted this testimony, stating that prior to the 1991 accident, he referred Green to a program at the VA hospital to deal with "problems pertaining to post traumatic stress syndrome as a result of his service in Vietnam" and that this program consisted both of group therapy and one-on-one therapy. Green did not inform any of his subsequent doctors that he had had individual therapy.

Green began seeing a psychologist in 1993 after complaining that he was afraid of driving, was having problems adjusting in the aftermath of the 1991 accident, and was having difficulties with family and friends. Plaintiff's psychologist testified that Green's PTSD was primarily the result of the 1991 accident, not of his experiences in Vietnam, although Green did experience some symptoms as a result of his military service. Plaintiff was also referred to a psychiatrist, who testified that Green's PTSD was a result of the 1991 accident because Green's symptoms commenced after the accident; his flashbacks, such as feeling the pole coming through the windshield, were specific to that accident; and he had functioned well between 1973 and 1991. The expert also testified that Green's condition had worsened after the 1994 accident.

Defendants presented several witnesses to challenge plaintiff's claim that he suffered psychological injuries as a result of the two accidents. The expert, Dr. Sorvino, a psychiatrist testifying on behalf of defendant NJM, interviewed plaintiff and diagnosed him with PTSD. Dr. Sorvino testified that he believed Green's PTSD was a result of plaintiff's experiences in Vietnam, exacerbated by the Persian Gulf War. The expert based this opinion on Green's own statement that he had been diagnosed with PTSD.

Dr. Sorvino also diagnosed Green with a paranoid personality disorder. He based this diagnosis on Green's statements that he "doesn't like doctors because they don't render honest reports"; that he was under surveillance by the "insurance people"; and

that he left that military "because he didn't like certain elements in the Army."

Finally, Dr. Sorvino diagnosed Green with a somatoform disorder, which occurs when a patient reacts to stress by subconsciously developing physical symptoms for which there is no physical cause. The psychiatrist found Green's level of flexibility to be inconsistent with his symptoms and opined that all three psychological conditions preceded and were causally unrelated to the 1991 accident.

Dr. Koziol, a neurological surgeon who had treated Green, was subpoenaed by defendant NJM. Dr. Koziol stated that Green's symptoms were "unusual" and did not fit any neurological pattern. The expert could not find any neurological cause for Green's numbness.

Another neurologist testified on behalf of defendants that Green's motor functions were normal and his neurological symptoms were consistent with a blood condition such as diabetes or exposure to alcohol or other toxins, not with nerve damage. The expert agreed with Dr. Sorvino's diagnosis of somatoform disorder and stated that Green's complaint had no neurological cause.

## B.

In his attempt to solicit evidence from plaintiff regarding his past psychological problems, defendant Ironbound's counsel asked Green at trial why he had decided to leave the military after an eight-year career. Green's counsel objected. At a sidebar conference, plaintiff's counsel explained that Green had testified in a deposition that he had left the service because "he had too many black people in his company that he was commanding." The portion of Green's deposition statement that defense counsel sought to elicit from plaintiff was as follows:

Q: Why did you decide to get out of the Army?

A: Quite honestly.

Q: Yes.

A: It got too black and too antidiscipline. You could not—I had a commander that would not instill discipline and he made you look like the bad guy when you went in to do minor reprimands on individuals. And when you're in charge of 60 some people, and God knows how many million dollars worth of equipment, and you front line troops going to rush—and adversing rush, and should they cross the border you must maintain—

Q: And what do you mean by "it got too black"? What do you mean by that?

A: Too Black. Well, current society. Okay. See when you have a platoon of 60 some people and three-quarters are black, and there's no motivating factor, when they are all ingrates. They all run around with the attitude you can't do nothing to me; I'll call it discrimination. You have no motivation, nor them.

Consequently, you're the bad guy, because everything falls on you, and you're expected to accomplish the mission no matter what, because you're the senior man for which I have no love for them. And you can put that on the record too.

Noting that three of the six jurors were black, Green's attorney argued that the probative value of evidence describing an event that happened almost twenty years before plaintiff's 1991 accident was outweighed by the potential prejudice that would result from the admission of such testimony. Defendant's counsel responded that because Green had presented himself as satisfied with his military career and generally happy prior to the 1991 accident, the deposition testimony was relevant to show that Green's personality was "warped for long before" the accidents in question.

The trial court found the deposition testimony too prejudicial to be admitted. The court, however, did not preclude inquiry into the stresses in Green's life prior to the accident, including any problems related to his military career, provided that no reference was made to Green's racist remarks.

Counsel for defendant Ironbound then asked Green why he left the military. Green responded that his primary reason for leaving the Army was that he "had enough combat" and "didn't need the environment." Ironbound's counsel moved for permission to read the passage from Green's deposition testimony regarding his military service for the purpose of impeaching plaintiff. The trial court stated its concern that if the deposition were admitted the jury would decide the case based on the fact that Green was a bigot, rather than on the facts of the case. Nevertheless, the court, influenced by Green's prior representation during the

*N.J.R.E.* 104 hearing that Green could "explain" his remarks to the jury, ruled that only a "minimal" risk of undue prejudice existed and allowed the impeachment.

When plaintiff was again asked why he left the military, he responded that the "entire platoon was undisciplined," both black and white, and that his comments in deposition were "not a racial thing." Ironbound's counsel then proceeded to read the above-quoted portion of Green's deposition statement to the jury.

The deposition statements were also discussed later in the trial, again in reference to Green's psychological condition, this time during Dr. Sorvino's expert testimony. Specifically, Dr. Sorvino testified that Green, who departed from the military because he "didn't like certain elements in the Army, . . . felt it was a black condition." On cross-examination, however, Dr. Sorvino conceded that Green had told the doctor only that he had left the Army because of "undesirables with no discipline." Dr. Sorvino admitted that he had been instructed by NJM's counsel prior to testifying to use the word "black" in his testimony because the jury contained three black members.

In closing arguments, NJM's counsel reminded the jury of the inconsistency in Green's remarks about why he left the Army. He referred expressly to the deposition testimony, saying: "[h]e leaves the Army in deposition because there were blacks. . . . He leaves because there are undesirables." Green's counsel, in closing, countered that "[r]ace has got nothing to do with this case." He went on to say that "[m]aybe Green is a bigot . . . And I'm going to ask you. What difference does it make what he said about Vietnam and the soldiers there? We all know that most of the kids there were black."

### C.

The jury found by a five-to-one vote that Green had suffered no injuries proximately caused by the 1991 accident, and was unanimous in finding that defendant Williams had not been negligent in the 1994 accident. Thereafter, the trial court determined the

outstanding PIP matter. The court was "clearly satisfied that [it could] conclude that [Green] wasn't in pain for a good portion of the trial." The court focused on Green's credibility, which it found to be undermined, directly or indirectly, by the testimony of Green's physicians and Green himself. Accordingly, the trial court found that the doctors' medical bills were not related to the 1991 accident and rendered a verdict in favor of NJM on the PIP issue.

The court also discussed its original ruling barring the statements in the deposition testimony, and concluded that at that time the matter had not yet been "ripe" for a ruling. Regarding Green's retirement from the Army, the court found that it was a "key" issue in the case, going both to plaintiff's credibility and to the substantive issue of damages. The court then denied Green's motion for a new trial as untimely filed.

On appeal, the Appellate Division affirmed the jury verdict on behalf of defendants and ruled that the bigoted statements were substantively relevant to Green's claims of psychological injury and to plaintiff's credibility as impeachment evidence. The dissent of Judge Petrella, as noted, expressed the view that the evidence of plaintiff's racial bias was inadmissible because the statements were only tangentially related to substantive and credibility issues and that its prejudicial effect outweighed its probative worth.

## II

Our rules of evidence provide that "relevant evidence may be excluded if its probative value is substantially outweighed by the risk of ... undue prejudice, confusion of issues, or misleading the jury ..." *N.J.R.E.* 403. Evidence should be barred if its probative value "is so significantly outweighed by [its] inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of the basic issue[s]." *State v. Thompson,* 59 *N.J.* 396, 421, 283 *A.*2d 513 (1971); *see State v. Moore,* 122 *N.J.* 420, 467, 585 *A.*2d 864 (1991).

■ The trial court is granted broad discretion in determining both the relevance of the evidence to be presented and whether its probative value is substantially outweighed by its prejudicial nature. *See State v. Carter,* 91 *N.J.* 86, 106, 449 *A.*2d 1280 (1982). Determinations pursuant to *N.J.R.E.* 403 should not be overturned on appeal "unless it can be shown that the trial court palpably abused its discretion, that is, that its finding was so wide off the mark that a manifest denial of justice resulted." *Ibid.; Thompson, supra,* 59 *N.J.* at 420, 283 *A.*2d 513.

## A.

■ The initial inquiry in reviewing the trial court's decision to admit plaintiff's deposition testimony regarding his racially biased reason for leaving the military is whether or not the testimony was relevant. "Relevant evidence" is any evidence "having a tendency in reason to prove or disprove any fact of consequence to the determination of the action," *N.J.R.E.* 401; "or, as in the federal rule, evidence which has a tendency to make 'more probable or less probable' a fact of consequence to the action," *id.,* 1991 Supreme Court Committee Comment; *see also State v. Millett,* 272 *N.J.Super.* 68, 88, 639 *A.*2d 352 (App.Div.1994). In determining relevance, the trial court should focus on "the logical connection between the proffered evidence and a fact in issue[,]" *N.J.R.E.* 401, Comment 1 (quoting *State v. Hutchins,* 241 *N.J.Super.* 353, 358, 575 *A.*2d 35 (App.Div.1990)), or "the tendency of evidence to establish the proposition that it is offered to prove," *State v. Wilson,* 135 *N.J.* 4, 13, 637 *A.*2d 1237 (1994).

Ironbound's counsel initially argued that plaintiff's deposition testimony was relevant because plaintiff

> has created the impression that he's a patriot. That he ... loved the service. ... That everything in the world was rosy and happy in his life ... and that he was in control of everything right up until the time of his '91 accident. ... [But] "nothing could be further from the truth." 2

---

2 Defense counsel offered these additional reasons for introducing plaintiff's deposition statements:

The trial court, in response, did not allow the deposition statement to be admitted as substantive evidence, concluding that it was too prejudicial, and for that reason allowed defendants to inquire only generally into the stresses in Green's life prior to the accident, including any problems related to Green's military career.[3]

Defendant then proceeded to question plaintiff regarding his reason for leaving the military. Plaintiff stated that he left the Army after his second tour in Vietnam when he had been transferred to Germany with another Army infantry division, which had "a life expectancy of one day if the Russians came across the border." Plaintiff testified that he had "had enough combat" and "didn't need the environment."

Based on plaintiff's answer, defendants again sought to admit Green's deposition testimony. The defense argued that Green was alleging total disability "from a psychiatric and physical point of view," that Green's testimony had not been credible and that Green "exhibited a willingness to say whatever he feels he has to say in order to achieve the goal of getting money from this jury." Ironbound's counsel also contended that Green's deposition statement could not effectively be edited, and that it should be admitted in full as a prior inconsistent statement to impeach Green's credibility. The attorney representing NJM agreed, explaining

---

[Green] testified that he got out of the service and had happened to use blacks as an example, and said . . . that there was no discipline, there was no control, and so forth. The man is a control freak. And it goes entirely to his personality which he's put in issue in this case, in which psychiatrists are going to testify about [how] this accident has damaged his personality. And his personality has been warped for long before both of these accidents, and this jury has to know that.

[3] The court explained its reasons for allowing the deposition evidence in a limited form:

I'm satisfied after hearing the argument here that your series of reasons can be given as to why he left the military and as to why he may have stress from the military, giving up his career, with divorce, two divorces and another myriad of reasons that can ultimately develop in the course of this man's life.

that the jury should know "who [Green] is" and that he lied on the stand. NJM's counsel acknowledged that the three black jurors would no doubt "be aghast" at Green's statements, but argued that they had "heard [such statements] before" and that their primary concern would be that the deposition statements were "not even close" to Green's in-court testimony.

The trial judge admitted the evidence at this time, stating that the testimony was relevant both to plaintiff's credibility and "to one of the major issues of damages in this case, . . . the post [t]raumatic syndrome," and that the risk of prejudice would be "minimal."

■ A plaintiff in a personal injury action "may be cross-examined as to prior injuries to show that his present [ ] condition did not result solely from defendant's negligent act, but was caused, wholly or partially, by an earlier accident or pre-existing condition." *Paxton v. Misiuk*, 34 *N.J.* 453, 460, 170 *A.*2d 16 (1961). Defendants, however, presented no evidence indicating that plaintiff's PTSD and paranoia were related to or implicated by his racist views expressed in terms of the lack of discipline exhibited by the black soldiers under his military command. Although defendant argues that Green's deposition testimony was relevant because it illustrates plaintiff's paranoia, Dr. Sorvino, the only doctor characterizing defendant with a paranoid condition, based his opinion only on the fact that plaintiff left the Army because of "undesirables" who lacked "discipline." Plaintiff's references to race as such in his deposition testimony were not relied upon by Dr. Sorvino and reveal nothing but simple bigotry. Without some proof that racism and paranoia are connected, which defendants do not offer, plaintiff's unsanitized deposition testimony was overinclusive and unnecessary to make defendants' point.

■ The relevance of Green's deposition testimony as impeachment evidence was also marginal. Although extrinsic evidence may be admitted to impeach a witness, *see N.J.R.E.* 607, its probative value as impeachment evidence must be assessed independently of its potential value as substantive evidence. *See State*

*v. Burris,* 145 *N.J.* 509, 535, 679 *A.*2d 121 (1996) (holding that for purposes of impeaching witness's credibility, "the only relevant previous statements would be those that contradict or call into question [witness's] version of events as recounted at trial.").

Green testified in his deposition that he left the service because the black troops under his command were undisciplined, creating a high-stress atmosphere for him. At trial, plaintiff testified that he left because he had "had enough combat" and "didn't need the environment." Although those two versions are different and the deposition testimony may therefore qualify as relevant impeachment evidence because it "calls into question" plaintiff's trial testimony, it does little to establish that plaintiff is a liar. Therefore, although we do not believe the trial court erred in finding Green's prior testimony relevant to plaintiff's credibility, this relevance was minimal.

■ The critical issue, however, is whether the worth of this evidence for substantive or impeachment purposes carries sufficient weight to overcome its prejudicial impact. The court may exclude relevant evidence if "its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence." *Ibid.* This balancing test applies whether or not the evidence is being admitted as direct evidence in the party's case in chief, or as indirect evidence for impeachment purposes. *See N.J.R.E.* 607, Comment 1 ("The use of extrinsic evidence to enhance or impair the credibility of a witness may generally be done by the party who called the witness as well as by an adverse party, although ... [t]he trial court still has discretion under *N.J.R.E.* 403 to exclude extrinsic evidence if the court finds that the probative value of the evidence is substantially outweighed by any of the counterfactors mentioned in that rule."); *see also State v. Mance,* 300 *N.J.Super.* 37, 61–62, 691 *A.*2d 1369 (App.Div.1997) (holding that evidence of prison guard's violations of prisoners' civil rights, although relevant to guard's bias and credibility, not admissible due to prejudice concerns).

In this weighing process, evidence that has overwhelming probative worth may be admitted even if highly prejudicial. "That evidence is shrouded with unsavory implications is no reason for exclusion when it is a significant part of the proof." *State v. Stevens,* 115 *N.J.* 289, 308, 558 *A.2d* 833 (1989) (quoting *State v. West,* 29 *N.J.* 327, 335, 149 *A.2d* 217 (1959)); *State v. Radziwil,* 235 *N.J.Super.* 557, 566, 563 *A.2d* 856 (App.Div.1989) (probative value of even highly inflammatory evidence may allow for its admission), *aff'd o .b.,* 121 *N.J.* 527, 582 *A.2d* 1003 (1990). Even given the danger that "the jury might disregard the issues of the case and base their verdict on their reaction to the picture that evidence might portray of the plaintiff's character," *Stoelting v. Hauck,* 32 *N.J.* 87, 104, 159 *A.2d* 385 (1960), if that evidence is "central" to the case it should not be excluded "for fear that it might put one of the parties in a bad light." *Id.* at 104–05, 159 *A.2d* 385.

There can be no dispute that evidence of bigotry can have a damaging effect on the fairness of a legal proceeding. We have, in a variety of contexts, addressed the particularly corrosive influence that racial animus can have in the administration of justice. *See State v. Apprendi,* 159 *N.J.* 7, 731 *A.2d* 485 (1999) (holding that defendant's bias in hate-crime prosecution should be a sentencing enhancer for consideration only by the trial judge and declining to follow general practice in hate-crime prosecution that would require jury to find bias to be an element of the crime); [4] *id.* at 29, 731 *A.2d* 485 (Stein, J., dissenting) (suggesting if racial bias were material element of hate-crime prosecution, its determination by jury should be bifurcated to avoid undue prejudice); *State v. Cromedy,* 158 *N.J.* 112, 727 *A.2d* 457 (1999) (requiring

---

[4] The Court further stated:

> To allow generally in criminal trials proof of the biases of the accused creates an added risk of prejudice for defendants. It would open trials to evidence of former acts of bias on the part of the actor ... [and] inject into the trial of cases issues of racial or ethnic bias that have a potential to inflame a jury.
>
> [*Apprendi, supra,* 159 *N.J.* at 26, 731 *A.2d* 485 (citations omitted).]

jury instruction regarding unreliability of transracial identifications at request of defendant in cases turning primarily on eyewitness identification); *State v. Mortimer*, 135 *N.J.* 517, 641 *A.*2d 257 (1994) (upholding constitutionality of State's harassment statute in which evidence of defendant's bias would be central, but setting high standard for admissibility of such evidence); [5] *State v. Rose*, 112 *N.J.* 454, 489, 494, 548 *A.*2d 1058 (1988) (ruling in capital-murder prosecution that while defendant's statement that he purchased a shotgun because he was "having trouble with some niggers in New Jersey," was properly admitted by the State as rebuttal evidence and was relevant to defendant's state of mind and that counsel is given considerable leeway in cross-examination, statement should have been excluded because its limited relevance was substantially outweighed by its prejudicial nature); *State v. Ramseur*, 106 *N.J.* 123, 245–46, 524 *A.*2d 188 (1987) (holding that thorough *voir dire*, upon request by defendant, is required to prevent infection of death-penalty case juries with racial bias); *State v. Gilmore*, 103 *N.J.* 508, 535–37, 511 *A.*2d 1150 (1986) (holding that presumption in favor of prosecution's permissible use of peremptory strikes may be rebutted by defendant's *prima facie* showing that prosecution exercised its peremptory challenges based on generalizations regarding racial groups, and requiring prosecution to provide legitimate non-race-based reasons for striking jurors); *State v. Athorn*, 46 *N.J.* 247, 251–52, 216

---

[5] The Court stated:

> Although we concede that a defendant's bigoted thoughts, expressions, and associations may be relevant in some cases to prove selection of a victim based on the victim's status, that evidence will not be admissible in all circumstances. Trial courts should analyze most carefully any proffered evidence of a defendant's prior statements and associations to insure that a close connection exists between that expression and the defendant's commission of a predicate offense. Absent a close nexus, the probative value of the evidence is substantially outweighed by the danger of undue prejudice; without that nexus the trial court should not admit the evidence to prove that a defendant acted with the motivation subsection d [of the statute] requires.
>
> [*Id.* at 538, 641 *A.*2d 257.]

A.2d 369 (1966), (articulating general rule that jurors may not be called back for questioning regarding their verdict after they have been discharged, and exception to rule "where a juror by his comments in the jury room manifests racial or religious bigotry against a defendant.").

The inflammatory nature of the evidence at issue is obvious. Defense counsel understood this, observing that the three black jurors would no doubt "be aghast" at Green's statements. Also obvious, but not articulated, is that the testimony would have the power to inflame and antagonize non-black members of the jury as well.

The trial court clearly recognized the potential for the prejudicial impact of the evidence. In its initial ruling on the proffer of plaintiff's deposition testimony, the court found that the testimony was inadmissible because of its prejudicial nature, stating:

> If what I just heard is presented to the jury that three-quarters of a platoon being black and that they're ungrateful and they lack discipline and things of that sort. If . . . you're going to put in the troops lack discipline and that['s] the reason why he had to get out that's one thing. Because they're black and they lack discipline or just because they're black; I won't permit [it].

The court then added:

> [Introducing] evidence [that the troopers lack discipline . . . [b]ecause they're black] into the record at this time with . . . three persons we have on this jury [who] are black—will introduce an element into this case that I'm satisfied will . . . [a]ffect and destroy the ability of the plaintiff to have a fair trial.

> Plaintiff's bigoted remarks were highly offensive. *Accord Taylor v. Metzger,* 152 *N.J.* 490, 503, 706 *A.2d* 685 (1998) (noting in discrimination case under LAD: "However irrational racist speech may be, it hits right at the emotional place where we feel the most pain.") (quoting Mari J. Matsuda, *Public Response to Racist Speech: Considering the Victim's Story,* 87 *Mich.L.Rev.* 2320, 2338 (1989)). These bigoted remarks should have played no role in this personal injury action. We cannot ignore the possibility that the perfectly predictable and real emotional pain and resentment stemming from their expression could overshadow the relevant legal issues required to be fairly resolved in this lawsuit.

Even when an instruction is given to limit the manner in which a jury may consider particularly prejudicial evidence,[6] New Jersey

---

[6] The trial court did not administer a curative jury instruction here.

courts have noted that such curative instructions may do little to overcome the prejudice caused by the admission of such evidence. A new trial must be demanded when "[t]he reverberating clang of the [prejudicial evidence] 'would drown out all weaker sounds.' " *State v. Prudden*, 212 *N.J.Super.* 608, 614, 515 *A.*2d 1260 (App. Div.1986) (quoting *Shepard v. United States*, 290 *U.S.* 96, 104, 54 *S.Ct.* 22, 25, 78 *L.Ed.* 196, 202 (1933)); *State v. Brunson*, 132 *N.J.* 377, 383–93, 625 *A.*2d 1085 (1993) (holding that because a limiting instruction is unlikely to cure prejudice, evidence of prior convictions involving similar offenses is admissible only if sanitized and if details are limited to degree and date of crime); *Rose, supra*, 112 *N.J.* at 489–90, 548 *A.*2d 1058 (holding that trial court should have given limiting instruction to jury when inflammatory evidence of defendant's bigoted remarks was admitted to demonstrate defendant's intent, and that evidence should have been excluded, in any case, under *Evidence Rule* 4). Where " 'the minute peg of relevancy' [is] so grossly obscured by the incompetent and damaging nature of the [evidence,] the testimony should [be] excluded upon a proper exercise of discretion." [7]  *West, supra*, 29 *N.J.* at 335–36, 149 *A.*2d 217. "[T]he more attenuated and the less probative the evidence, the more appropriate it is for a judge to

---

[7] Certain types of cases exist, certainly, in which bias evidence must be permitted, namely, those involving discrimination suits and bias crimes where racial bias is the central issue. *E.g. State v. Morton*, 155 *N.J.* 383, 453–54, 715 *A.*2d 228 (1998) (upholding trial court's *N.J.R.E.* 403 determination admitting defendant's statement that there was "one less cracker that he would have to worry about" after his crime, because the statement tended to show defendant's intent to kill the victim); *Taylor v. Metzger, supra*, 152 *N.J.* 490, 706 *A.*2d 685 (considering evidence of employer's racial epithet in an employee's discriminatory harassment suit under the LAD); *State v. Carter, supra*, 91 *N.J.* 86, 449 *A.*2d 1280 (permitting State to introduce evidence of defendant's relationship with the family of a black man murdered at local tavern in support of its theory that motive for the murder of defendant's victims, a white bartender and several white patrons, was revenge); *State v. Crumb*, 277 *N.J.Super.* 311, 318–19, 649 *A.*2d 879 (App.Div.1994) (holding that written materials expressing the defendant's neo-Nazi views and hatred of blacks were admissible as evidence of defendant's motive for an assault on an elderly stranger without any apparent reason because the defendant's motive was "central to the case."), *cert. denied*, 153 *N.J.* 215, 708 *A.*2d 66 (1998).

exclude it...." *State v. Medina*, 201 *N.J.Super.* 565, 580, 493 *A.*2d 623 (App.Div.), *cert. denied*, 102 *N.J.* 298, 508 *A.*2d 185 (1985). The issue, then, is whether the undeniable prejudicial effect of this evidence substantially outweighed its probative worth.

In making determinations about the admissibility of evidence of racial bias, trial courts should look not only to the close nexus between the evidence and a central issue in the case, but also to the availability of other evidence to shed light on that issue. *State v. Johnson*, 120 *N.J.* 263, 298, 576 *A.*2d 834 (1990) (stating that evidence that is "largely corroborative of other, essentially unchallenged testimony ... is only minimally probative...."). Evidence of an inflammatory nature, in particular, must be excluded if other probative, non-inflammatory evidence exists. *See State v. Davis*, 116 *N.J.* 341, 366, 561 *A.*2d 1082 (1989); *State v. Lockett*, 249 *N.J.Super.* 428, 432–33, 592 *A.*2d 617 (App.Div.) (holding as reversible error trial court's admission of grisly pre-autopsy photographs of pedestrian struck by defendant's automobile for purported purpose of showing nature of victim's injuries and speed of vehicle as it struck victim), *cert. denied*, 127 *N.J.* 553, 606 *A.*2d 366 (1991); *Prudden, supra*, 212 *N.J.Super.* at 614, 515 *A.*2d 1260.

Those guiding principles were not followed in this case. First, the deposition testimony at issue was only minimally probative as substantive evidence of plaintiff's mental state; its nexus to his psychological condition was attenuated. *See supra* at 494–95, 734 *A.*2d at 1154–55. Further, the probative value of the evidence for impeachment purposes was marginal. Plaintiff's trial testimony was vague; it is not clear that he actually contradicted his prior statement when he indicated that he left the military because he had "had enough of the environment."

In addition, other evidence regarding Green's lack of credibility was available. The deposition testimony, as used by the defense to impeach plaintiff, was purely "piling on." As the trial court itself observed, "[t]here's a lot of different ways to affect the credibility of Mr. Green." The trial court noted that Green had effectively been impeached on his testimony that he had a satisfac-

tory life prior to the accident in a variety of ways: Green had been confronted with evidence of his divorces; the fact that he was in Vietnam; that he had experienced flashbacks of his Vietnam experience triggered by the Gulf War; and that he had been treated at Lyons VA in a program for veterans with PTSD.

Finally, the inflammatory testimony could have been sanitized, thereby eliminating its prejudicial effect without diminishing its probative value. *See Overlook Terrace Corp. v. Excel Properties Corp.,* 210 *N.J.Super.* 420, 425, 510 *A.*2d 68 (App.Div.1986) (noting that even where admissible, prejudice should be minimized by sanitizing to redact most inflammatory aspects); *Gustavson v. Gaynor,* 206 *N.J.Super.* 540, 546–47, 503 *A.*2d 340 (App.Div.1985) (reversing judgment for plaintiff in negligence action based on admission of evidence of defendant's alcohol consumption before the accident because defendant's activities could have been demonstrated by only a "general reference"), *cert. denied,* 103 *N.J.* 476, 511 *A.*2d 655 (1986). In recognizing the impermissible prejudicial impact of plaintiff's statement that his troops lacked discipline because they were black, the trial court itself implicitly acknowledged the possibility that this offensive feature could have been excised. *See supra* at 497, 734 *A.*2d at 1156 ("If [defense counsel's] going to put in [evidence that] the troops lack discipline and that's the reason why he had to get out, that's one thing [that may be permitted.]").

██  We determine that evidence demonstrating the racial bias or bigotry of a testifying party, *regardless* of the racial composition of the jurors, will almost always have the potential to prejudice the witness so dramatically that it will almost certainly "drown out all weaker sounds" that might otherwise buttress its admissibility and blunt its harmful impact. Those weaker sounds cannot, in such cases, be amplified by curative instructions. We conclude that the relevance of plaintiff's deposition testimony was so remote and attenuated, and the substance so cumulative, that its probative value was substantially outweighed by its exceedingly

inflammatory nature. The trial court, therefore, erred by admitting the evidence.

## III

■ We must consider whether the trial court's decision to admit plaintiff's deposition testimony was "clearly capable of producing an unjust result." *R.* 2:10–2.

We agree with the trial judge's characterization of the issue— "the problem in a nutshell"—that the jury might decide the case solely or even partially on the basis of Green's racist views. The prejudicial nature of plaintiff's deposition testimony makes it highly likely that its improper introduction influenced the jury and therefore led to an unjust result.

The proofs in this case may preponderate toward defendants, but do not overwhelmingly favor one party or the other; hence, the smear on Green's character could have been the deciding factor against him. *Cf. State v. Frost,* 158 *N.J.* 76, 87, 727 *A.*2d 1 (1999) (noting that where credibility is the central issue and the "jury must choose which of the two opposing versions to credit, it simply cannot be said that the evidence is overwhelming[ly]" against one litigant or the other.) The risk that the jury was improperly influenced by allegations of plaintiff's racism is especially high here because Green's credibility was so central to the disposition of the case.

In spite of all the expert testimony challenging Green's version of the facts, in addition to plaintiff's own inconsistent statements, the evidence in favor of Green was not so lacking as to discount the fear that the jury's verdict was influenced by the improperly admitted evidence. *E.g. Prudden, supra,* 212 *N.J.Super.* at 614, 515 *A.*2d 1260. Several facts in the record point to the conclusion that the jury might have been substantially influenced by the improper admission of evidence of Green's bigotry. The verdict was rendered by a five-to-one vote, indicating that one reasonable juror did in fact find Green sufficiently credible to vote in his favor; the witness testimony on behalf of Green was not so lacking

in credibility or substance as to render it completely unbelievable; the tortfeasor in the 1991 accident settled with Green for the full sum of his insurance coverage; and On Time Transport and Deborah Dreyer settled before trial, indicating that Green's claim regarding his alleged injuries caused by the 1994 accident had some merit.

We reject defendant Ironbound's contention that plaintiff's deposition testimony was irrelevant or inconsequential with regard to the 1994 accident. That argument is disingenuous and belied by the fact that it was Ironbound's counsel who devised the strategy to introduce Green's racism into the case and so vigorously pressed the trial court to admit the evidence for purposes of impeaching plaintiff, claiming that it was crucial to establish the unreliability of Green's trial testimony.

Moreover, the court unnecessarily exacerbated the prejudicial effect of this evidence by instructing the jury that statements from depositions were substantive evidence for the jury's consideration just as the in-court testimony was.

Finally, we are particularly concerned with the strategy used by the defense counsel in this case. Despite the acknowledged and expressed misgivings of the court concerning the inflammatory and prejudicial impact of this evidence of racial bias, defendants purposefully played on its inflammatory nature throughout the trial. Counsel exploited the deposition testimony by suggesting that Dr. Sorvino alter his testimony and to use the word "black" in expressing his opinion. This tactic rendered the opinion of the expert not only highly inflammatory, but also misleading, and further put the trial in jeopardy. The damage was again augmented when NJM's counsel referred to plaintiff's racist comments in summation. In determining whether the verdict should be set aside, we cannot disregard or dismiss the attorney's role in increasing the prejudice to plaintiff's case. These actions, like prosecutorial misconduct, add to the egregiousness of the error in the admission of prejudicial evidence.

V

The judgment of the Appellate Division is reversed, and the matter is remanded to the Law Division for a new trial.

POLLOCK, J., dissenting.

I agree with the majority that defense counsel erred in injecting plaintiff's racism at trial. Given the totality of the trial, however, the error was "not clearly capable of producing an unjust result." *R.* 2:10–2. Accordingly, I would affirm the judgment of the Appellate Division.

The record reveals that the trial, which lasted eleven days, focused on the credibility of plaintiff and his experts. At trial, plaintiff claimed that he was suffering from extensive physical and psychological injuries as a result of two automobile accidents in 1991 and 1994. Indeed, plaintiff's counsel asserted in his opening statement that, before the 1991 accident, plaintiff was a "100 percent functioning unit." Throughout the trial, defense counsel attacked that assertion. For example, defense counsel elicited on cross-examination that in numerous accidents plaintiff had suffered serious physical injuries before 1991. The prior accidents included a 1982 automobile accident, a 1982 work-related accident, slip-and-fall accidents in 1983 and 1991, and other accidents resulting in bone fractures.

Defense counsel also challenged plaintiff's testimony on direct examination that he had not suffered any stressful, personal events in his life. On cross-examination, plaintiff conceded that he had been divorced twice. Other evidence demonstrated that the cause of plaintiff's post-traumatic-stress-disorder was not the 1994 accident, but his military service during the Vietnam War.

Defense counsel undertook vigorous cross-examination of plaintiff's experts. For example, Dr. Sheldon Birnhak, plaintiff's primary treating physician, testified on direct examination that plaintiff had a history of only minor back pain. A review of Dr. Birnhak's records, however, revealed that plaintiff had missed

three weeks of work in 1982, after injuring his back at work. Furthermore, plaintiff had been hospitalized for a month for a severe back injury suffered in the 1982 automobile accident. In 1984, plaintiff had complained to Dr. Birnhak of numbness in both arms, and thus was referred to an orthopedist, an osteopath and a neurologist. Similar inconsistencies permeated the testimony of plaintiff's other experts. The point of the foregoing recitation is to demonstrate that quite apart from their regrettable reference to plaintiff's racism, defense counsel provided the jury with ample evidence to find plaintiff incredible.

Although I agree with the majority that defense counsel erred by introducing plaintiff's racist comment, I would find the error harmless. The majority could effectively condemn defense counsel's conduct without subjecting the parties and the public to the expense of an additional trial.

Chief Justice PORITZ joins in this dissent.

*For reversal and remandment*—Justices HANDLER, O'HERN, GARIBALDI, STEIN and COLEMAN—5.

*For affirmance*—Chief Justice PORITZ and Justice POLLOCK—2.