**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3387-15T1

JOSEPH MILUTIN,

     Plaintiff,

and

ROBERT HEALEY,

     Plaintiff-Respondent/
     Cross-Appellant,

v.

STATE OF NEW JERSEY,
DEPARTMENT OF CORRECTIONS,

     Defendant-Appellant/
     Cross-Respondent.

_____

     Argued May 17, 2018 – Decided October 12, 2018

     Before Judges Simonelli, Haas and Gooden Brown.

     On appeal from the Superior Court of New Jersey, Law
     Division, Mercer County, Docket Nos. L-3118-06 and
     L-3119-06.

Melissa A. Salimbene argued the cause for appellant/cross-respondent (Chiesa Shahinian & Giantomasi PC, attorneys; Catherine P. Wells, of counsel and on the brief).

Gina Mendola Longarzo and Kara A. MacKenzie argued the cause for cross-appellant/respondent.

The opinion of the court was delivered by

SIMONELLI, P.J.A.D.

Plaintiff Robert D. Healey, a Caucasian Corrections Officer, sued defendant State of New Jersey, Department of Corrections (DOC) for discrimination, harassment, and retaliation in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 to -49. A jury rendered a verdict in favor of, and awarded damages to, plaintiff and his co-plaintiff, Joseph Milutin.[1] The DOC appeals from the March 3, 2016 final judgment and orders denying various motions. Plaintiff cross-appeals from the May 17, 2016 order denying his request for additional attorney's fees, costs, and pre-judgment interest. We reverse and remand for a new trial.

I.

The Facilities and Personnel
During the Relevant Time Period

---

[1] Plaintiff's and Milutin's cases were consolidated for discovery and trial. Milutin has settled with the DOC.

A-3387-15T1

The Albert C. Wagner Youth Correctional Facility (Wagner), located in Bordentown, had a satellite facility in New Lisbon known as the Strategic Reintegration Program or "Boot Camp." Boot Camp is a regimented eight-month program for non-violent offenders between the ages of eighteen and twenty-five, who are referred to as cadets. The program involves physical training and marching.

Boot Camp had two command structures -- custody and civilian. James Glover, an African-American, was head of custody at Boot Camp and Acting Chief at Wagner, the highest ranking uniformed officer. Lieutenants Trask Lyons and Patrick Schoettmer, both Caucasian, were supervisors at Boot Camp who reported directly to Glover. Below them were Sergeants Robert Ronda, a Cuban-American, Paul Miller, whose race was not specified, and John LaPierre, James Pinder, Neil Salaga, and Jim Lemley, all Caucasian. The Corrections Officers (COs) were plaintiff, Joseph Milutin, Anton Wille, and Charles LaBelle, all Caucasian, and Sultan Mohammed, Charles Winters, Shari Ducote and Joyce Butler, all African-American.

Derrick Loury, an African-American, was supervisor of Boot Camp's civilian staff, which included medical staff, counselors, teachers and secretaries. Loury reported directly to Wagner's Assistant Superintendent Michael McKeen, a

 A-3387-15T1

Caucasian, and McKeen reported to Wagner's Administrator Bette Norris,[2] an African-American. Sergeant Jelani Nyahuma, an African-American, also worked at Wagner, as did COs Steven Mellick and Richard Cheesman, both Caucasian.

Ronda's Complaint

In September 2004, Ronda filed a complaint with the DOC's Equal Employment Division (EED) accusing Lyons and Pinder of discrimination. Ronda also claimed that Loury said he was "going to get" him "out of [Boot Camp]" if he pursued his complaint against Lyons.

Plaintiff testified at trial that Loury asked him to testify against Ronda at the EED hearing. Plaintiff declined because he had heard Pinder refer to Ronda as "Speedy Gonzales" in a comment to Lyons. Loury "stormed away mad" after plaintiff declined to testify. Milutin testified at trial that in March or April 2005, Loury asked him to testify on the DOC's behalf and say he never heard Lyons or Pinder call Ronda "Speedy Gonzales" or "the crazy Cuban."

Milutin, who heard those comments, testified that he told Loury, "I'm not going to lie for you[,]" and Loury "lost it." Milutin and plaintiff testified that Ronda's complaint was successful. Milutin also testified that despite Ronda's success, within a year, Lyons was promoted from Lieutenant to Captain and Pinder was promoted

---

[2] Norris's last name was Harris during trial.

from Sergeant to Lieutenant.

LaPierre testified at trial that he heard Lyons and Pinder refer to Ronda as "Speedy Gonzales" and "spic." He also gave a statement in support of Ronda's complaint and testified at the EED hearing. He said that Loury told him not to testify against Lyons and Pinder and, if he did, "something bad" might happen to him. He also said that Lyons threatened "to get [him]."

According to LaPierre, after Ronda filed his complaint, he (LaPierre) was disciplined. He explained that he and Loury discussed giving out awards, positive and negative, to the cadets. One of the awards he chose to present to two cadets on March 2, 2005, was what he called the "dickhead of the night" award. He claimed that both cadets said they deserved the award for their unspecified actions. However, as a result of presenting this award, charges were filed against him, and he was reassigned to Wagner and issued and ten-day suspension, which was later reduced to three days. He believed this disciplinary action was in retaliation for supporting Ronda.

LaPierre also testified that Loury made racial comments to him, calling him "pretty tight-ass white boy," "cracker supervisor," and "onion." He wrote a report to Lyons, dated September 22, 2004, stating that he was being subjected to a hostile work environment, and asking Lyons to intercede in the matter. Loury responded

by issuing a memo cautioning staff about creating a hostile work environment. Lyons told him he "should not be putting this kind of stuff on paper."

<u>Plaintiff's Experience at Boot Camp and Wagner</u>

Plaintiff began working at Boot Camp in January 2005. He had worked for the DOC since May 1990 at Rahway State Prison before transferring to Boot Camp. He worked the second shift at Boot Camp, from 1:00 p.m. to 9:00 p.m. He testified that when he first arrived there, "everybody was walking on eggshells."

Plaintiff testified that Loury and others made racial remarks to him. Loury, Mohammed, Winters and Butler called him an "onion." Butler also once said to him and Milutin, "you onions need to stop taking my overtime" and called him a "cracker." He heard such comments anytime he or Milutin worked overtime and the comments were "deeply hurtful." He complained to Ronda, LaPierre, and Miller about being called a "cracker." Each of them said they would talk to Butler; however, Butler's comments did not stop. Winters also called him a "cracker" once or twice, and Mohammed told him he could not relate to the African-American cadets. Plaintiff also heard Ducote make racial remarks of a sexual nature, comparing the genitalia of Caucasian and African-American men and saying Caucasian men were only good for oral sex. He reported these remarks to LaPierre; however, in his deposition, he testified he did not complain to anyone about the

6

"onion" comments.

Milutin testified that when he transferred to Boot Camp in January 2005, he saw there were racial cliques among the officers. He said, "the tension w as intense . . . . Just by walking in the door you could feel animosity, tension from people I didn't know."

LaPierre described the work environment at Boot Camp as "hostile," and claimed Loury would put supervisors against officers and each other and favor African-American officers and cadets over Caucasian and Latino officers and cadets. Among the officers Loury favored were Winters and Butler on the first shift and Mohammed on the second shift. LaPierre testified he received complaints from Caucasian officers, including plaintiff and Milutin, that they were called racial epithets such as "onion," "white boy" and "white devil." He brought these complaints to Loury's attention, and Loury laughed and said plaintiff and Milutin should "just take it on the chin." Loury also said it would not be in their best interest to file an EED complaint. LaPierre did not file an EED complaint because of what happened to him as a result of the report he wrote to Lyons in the Ronda matter.

LaPierre also testified he also heard Butler make racially derogatory comments towards plaintiff and Milutin, such as calling them "white boys" and "crackers." He heard Ducote say that African-American men had bigger genitalia,

and told her to stop making those remarks. Ducote stopped for a while, but then continued several weeks later. He also heard Mohammed call plaintiff and Milutin "crackers," "white boys" and "white devils." He told Mohammed to stop, and he did so.

### The Instant Corrective Action Incident at Boot Camp

At approximately 7:00 p.m. on July 27, 2005, plaintiff, Milutin and Wille discovered that someone had stolen a soda from the unit's refrigerator. An officer could perform an instant corrective action (ICA) on an individual cadet, but needed approval if the ICA involved the entire company of cadets. An ICA consisted of physical exercises, including pushups, for forty-five to sixty-minutes, after which the cadets stood in formation. Wille spoke to Ronda, the supervisor on duty, and asked permission to do a company-wide ICA because no cadet would accept responsibility for the theft. Ronda authorized the ICA.

Plaintiff testified it was extremely hot during the day on July 27, 2005, but the weather changed between 7:00 p.m. and 7:30 p.m. when a thunderstorm came through and the temperature became "significantly cooler." The ICA began shortly after 8:00 p.m., lasted for twenty to thirty minutes, and was conducted inside because it was wet outside. The windows were open during the ICA, the fans were on, and the cadets had access to water and the bathrooms. The fans were turned off at 8:45

p.m. because, according to plaintiff and LaPierre, they were always turned off when the officers did a cadet count.

Milutin testified that during the ICA, cadets were permitted to use the bathroom and get a drink of water, the fans were on, the windows were open, the outside temperature was seventy-five degrees, and none of the cadets made any complaints during or after the ICA.

Butler conducted the cadet count that night. Plaintiff testified Wille closed the windows because it started raining again and the officers were concerned that some of the cadets' beds could get wet due to the direction of the rain. Plaintiff left at 9:00 p.m. when his shift ended, and the facility was not "messy" when he left.

Miller testified that he worked the third shift on July 27, 2005. When he arrived at about 9:00 p.m., there was lightning and thunder in the area and the windows were shut. Ronda told him about the ICA that had taken place earlier. Miller did not see any of the cadets sweating, red-faced, out of breath, or visibly shaking, and did not receive any complaints from them about the ICA. He also did not receive any complaints from the other officers that any of the cadets were in distress. In addition, the temperature in the facility was not excessive when he arrived; clothing, sheets and towels had not been thrown about; he did not see any cadets take a shower that night; and the cadets "were as quiet as church mice."

9

Salaga testified for the DOC. He arrived for his shift at 5:00 a.m. on July 28, 2005, and noticed a large pile of white towels on the floor, which he found to be unusual because there was a laundry room in the facility. He also found the cadets were unusually quiet. He asked a third shift Sergeant named Leek, a Caucasian, if anything had happened, and Leek told him "nothing out of the ordinary."

According to Salaga, because some of the cadets looked tired and "worn down," and because of unspecified statements they made to him, he became "concerned" and called Schoettmer, who was the highest ranking officer at Boot Camp at the time. Salaga wrote a report that he gave to Schoettmer.

Schoettmer testified that he learned of the ICA when he reported to work on July 28 and saw Salaga. He described the building as being hot and humid and in disarray, with a huge pile of towels in the laundry room. An hour or so later, Glover, Norris, two people from the DOC's Special Investigations Division (SID), and the union representative, Cheesman, arrived.

Loury testified that when he arrived at Boot Camp on the morning of July 28, Schoettmer told him there was a "problem." Loury wrote a report to McKeen detailing his findings. He reported that plaintiff, Milutin and Wille closed the windows and turned off the fans during the ICA and turned on the dryer in the linen room while removing the filter so that the heat from the dryer would enter the

A-3387-15T1

facility. He reported that he was told Wille took the towels away from the cadets so they could not wipe their faces after doing the exercises, and put the cadets at "parade rest" after they exercised for sixty-five minutes, from 7:45 p.m. until 8:50 p.m. He also reported that six to twelve cadets were overcome by heat exhaustion, "some became very ill, some were vomiting and some were cramping from these extreme unauthorized activities." He recommended that the DOC undertake an administrative investigation.

Plaintiff was instructed to report to the SID in Bordentown. He gave a written statement to the investigators, wherein he stated that the windows were closed at 8:45 p.m. because the cadets were "still acting up." Plaintiff testified that he made this statement because "[his] brain was going faster than what [he] was writing." He maintained that the windows were never closed as a disciplinary measure.

On July 29, 2005, Norris reassigned plaintiff, Milutin, Ronda and Wille to Wagner pending an investigation and banned them from entering Boot Camp grounds. Plaintiff testified that, while he had seen officers reassigned in the face of pending charges, he had never seen a formal ban. LaPierre testified that Lyons and Pinder were not banned from Boot Camp after Ronda filed his complaint. LaPierre also described an incident at Boot Camp prior to plaintiff's arrival where Winters flipped over a cadet's bunk and broke the cadet's ankle, but Winters was not banned

11

from Boot Camp as a result of that incident.

Plaintiff was assigned to the second shift at Wagner in a fill-in role. He could not answer codes and was restricted to the grounds. As a fill-in officer, he did not know from day-to-day what he would be doing. He performed what he described as "undesirable tasks," such as strip searches.

Miller testified that several days after the ICA, several cadets approached him and told him that Winters told them to fake injury and illness so that plaintiff and Milutin would be transferred and Winters could then work overtime. Miller wrote a report as to these conversations and sent it to Schoettmer. LaPierre testified that several cadets told him plaintiff, Milutin and Wille were being "framed" by Winters, Butler and Salaga. LaPierre transmitted this information to Loury and Schoettmer; however, no one from the SID ever contacted him.

The SID issued a report concluding that plaintiff, Milutin and Wille made the cadets exercise in an "extremely heated dormitory" as punishment for the theft of the soda, and created a "health hazard" by turning off the fans and closing the windows to elevate the heat in the dormitory.

According to LaPierre and Cheesman, on August 16, 2005, plaintiff's, Milutin's, and Wille's positions at Boot Camp were put up for bid, a formal process wherein the DOC solicits applications for a vacant position. LaPierre testified that

this was unusual because typically the jobs of officers under investigation were not put up for bid until after the case was decided. He also testified that two of the three officers who replaced plaintiff, Milutin and Wille were African-American, one was a new recruit without experience, and Loury told him the "good ol' boys won't come back."

Schoettmer testified that plaintiff's, Milutin's and Wille's jobs were put up for bid because he was short on staff as a result of their transfer to Wagner. He contacted Glover, who asked officers at Wagner to work at Boot Camp on a volunteer basis.

Cheesman testified that he never saw a situation where officers found not guilty of charges were not permitted to return to their bidded posts, and never saw officers restricted to the grounds of Wagner. He also testified that Glover and Norris told him plaintiff, Milutin and Wille would not be returned to their positions at Boot Camp.

The DOC served a preliminary notice of disciplinary action (PNDA) on Milutin on August 23, 2005.[3] The PNDA stated that Milutin was subject to suspension for thirty days for participating in a corrective action exercise that lasted approximately thirty-five minutes while fans were turned off and windows were closed, "creating an unsafe, high temperature within the dormitory." Such behavior,

---

[3] There is no PNDA in the record as to plaintiff and Wille.

13

A-3387-15T1

according to the PNDA, "constitute[d] abuse of an inmate and conduct unbecoming."

On October 14, 2005, plaintiff, Milutin, and Wille appeared at a disciplinary hearing, after which the charges against all three officers were dismissed. Thereafter, Cheesman asked Norris and Glover to return the officers to Boot Camp, but they refused. Cheesman testified that Norris said, "they're never going back."

Plaintiff testified he asked Cheesman when he would be returned to Boot Camp. Cheesman told him that Norris said he was not going back there. He then asked Norris directly when he would be going back, and she told him he was never going back and he should get used to working at Wagner. He also claimed his request for a transfer to East Jersey State Prison was not granted because Norris refused to sign off on the transfer.

<u>Plaintiff's Experience at Wagner</u>

According to Cheesman, there was racial tension at Wagner, where approximately seventy percent of the officers and inmates were African-American in 2005. He testified that African-American and Caucasian officers would sit separately in the cafeteria, and there were racial derogatory comments made.

Mellick testified there was little racial harmony among the officers and they ate at separate tables. He heard plaintiff and Milutin referred to as the "beat-down crew." He also testified that Nyahuma was hostile towards Caucasian officers, he

14

heard Nyahuma refer to them as "crackers" and "punk-ass white officers," and Nyahuma would "write up" Caucasian officers, but not African-American officers.

While at Wagner, plaintiff worked under Nyahuma. Plaintiff testified that Nyahuma called him a "cracker" a "handful" of times, and heard Nyahuma say, "we've got to get these crackers out of here." Plaintiff complained about these remarks to two Lieutenants at Wagner. He also claimed that Nyahuma "wrote him up" twice, once for not wearing a protective vest and once for not noticing that an inmate had covered up his window, but Nyahuma never wrote up an African-American officer. Plaintiff also testified that other officers called him and Milutin the "beat-down crew" on an almost daily basis. LaPierre testified that Nyahuma referred to plaintiff and Milutin as "crackers" and "white devils," and advocated "jihad" on Caucasians.

Plaintiff served as fill-in officer at Wagner until mid-2006, at which time he accepted a bidded job there. He testified he took the job because he believed he would not be permitted to return to Boot Camp. However, he returned to Boot Camp on June 23, 2006, when he accepted a bid on the third shift. He stayed on that shift for six or seven months and then moved to a second shift dorm officer position. During that time, he lent $350 to Latoya Cyrus, a civilian African-American staff member. Cyrus accused him of giving her the money for sexual favors. As a result,

Captain Bass, a Caucasian, sent plaintiff back to Wagner in September 2007.

Plaintiff filed a harassment complaint against Cyrus. At the hearing on the complaint, Cyrus recanted her accusation and was ordered to repay plaintiff the money he lent her. Plaintiff testified that Mohammed was involved in Cyrus's plan to extort money from him. After this incident, plaintiff accepted a second shift position at Wagner because he did not "want to be back in th[e] environment" at Boot Camp.

The DOC presented testimony from Loury, Salaga, Schoettmer, Norris, Lemley and LaBelle. Their testimony disputed the testimony of plaintiff and his witnesses and need not be repeated here at length .

The jury rendered a verdict in plaintiff's favor and awarded him $255,000 in compensatory damages, $5000 for monetary loss, $250,000 for pain and suffering, and $3 million in punitive damages. The DOC filed post-trial motions, which were denied.

## II.

On appeal, the DOC contends, in part, the trial judge made numerous erroneous evidentiary rulings that denied it a fair trial. "When a trial court admits or excludes evidence, its determination is 'entitled to deference absent a showing of abuse of discretion, i.e., [that] there has been a clear error of judgment.'" Griffin v.

City of E. Orange, 225 N.J. 400, 413 (2016) (alteration in original) (quoting State v. Brown, 170 N.J. 138, 147 (2001)). "Thus, we will reverse an evidentiary ruling only if it 'was so wide of the mark that a manifest denial of justice resulted.'" Ibid. (quoting Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999)).

## A.

The DOC sought to impeach plaintiff's trial testimony that Ronda asked him to testify in the EED matter and that he heard Pinder and Lyons refer to Ronda as "Speedy Gonzales" At his deposition, plaintiff testified he did not witness any comments made about Ronda and no one asked him to testify in the EED matter. The DOC sought to read the relevant portion of the deposition to the jury, but the judge sustained plaintiff's objection. The DOC argues that by prohibiting it from impeaching plaintiff with his admission that he did not engage in this protected activity (agreeing to testify for Ronda), the judge precluded the DOC from demonstrating that plaintiff failed to establish a critical element of his retaliation claim.

Contrary to its argument, the judge did not preclude the DOC from using plaintiff's deposition to impeach him. The DOC could have cross-examined plaintiff by asking him about his deposition testimony. Instead, it sought to read the deposition directly to the jury. This was impermissible. N.J.R.E. 803(a)(1) permits

A-3387-15T1

cross-examination of a witness by way of a prior inconsistent statement. State v. Silva, 131 N.J. 438, 444-45 (1993). In State v. Leopardi, 305 N.J. Super. 70, 81-82 (App. Div. 1997), we permitted the prosecutor to read a prior inconsistent statement of a witness to a jury after he had cross-examined the witness regarding the statement. The DOC did not do that here, but instead sought to read the deposition testimony to the jury before questioning plaintiff on the alleged inconsistency. Therefore, the judge did not abuse his discretion by denying the DOC's request to read plaintiff's deposition testimony directly to the jury.

In addition, the DOC sought to use plaintiff's deposition testimony to impeach his trial testimony that Loury said "onion" in his presence. At his deposition, plaintiff testified that Loury used the term "onion" numerous times, but not to his face or in his presence. The DOC's counsel asked plaintiff to read the deposition to himself and then asked whether his deposition testimony was consistent with his trial testimony. Plaintiff objected because counsel failed to establish there was a prior inconsistent statement. The judge responded "Yes," and then called a recess.

When trial resumed, the DOC continued by asking plaintiff whether he complained to LaPierre about the term "onion," as plaintiff had testified on direct examination. At his deposition, plaintiff testified he did not complain to anyone, but merely sought to clarify whether it was permissible to use the term "onion." Plaintiff

twice admitted that he answered "no" to the question at his deposition.  The DOC then sought to read the deposition testimony to plaintiff.  Plaintiff objected because there was no contradiction, and the judge sustained the objection. The judge's ruling was proper.  Since no inconsistency was established, there was no basis to read the actual language from the deposition.

The DOC further claims the judge erred in denying its request to read plaintiff's entire deposition into the record during its case-in-chief, thereby violating <u>Rule</u> 4:16-1.  We disagree.

<u>Rule</u> 4:16-1(a) provides, in pertinent part, that "so far as admissible under the rules of evidence . . . [any] deposition may be used by any party for the purpose of contradicting or impeaching the testimony of deponent as a witness[.]"  In addition, an adverse party may use the deposition of a party for any purpose against the deponent.  <u>R.</u> 4:16-1(b).  In denying the request to read plaintiff's entire deposition, the judge stated:

> [T]he reason why the depositions that you wanted to read were not read during cross examination is because you didn't complete the evidentiary steps to be able to get it in, and . . . losing the ability to do that, doesn't mean you get a second shot at it in your case-in-chief by being able to read it. . . . I wouldn't allow it, as well, simply because there was no notice pretrial provided to the plaintiff as required by the rules of discovery.

> And I wouldn't allow it, as well, for the additional following reasons. The first is that reading . . . is cumulative and is not relevant. Second, when you're talking about plaintiff . . . describing how he learned about onion, and explains that he never told anyone that he found it racially harassing, that's also cumulative . . . because he was cross examined and examined at length about it, and if it was not explored on cross examination to the extent that you want it to, I can't be held accountable for that.
>
> . . . .
>
> Given the length of this trial, how this trial is progressing, with regards to the presentation of evidence to the jury, while normally I would be a little bit more liberal in allowing cumulative evidence to be presented . . . you spent a lot of time with [plaintiff] on the stand, over a day, and these issues were addressed at that point.

It is appropriate for a trial judge, confronted with opposing evidential considerations, to take into consideration the concern for the orderly and efficient administration of the trial process. State v. Garfole, 76 N.J. 445, 456-57 (1978). Given the cumulative nature of the deposition sought to be read, and in light of the testimony the DOC had already elicited from plaintiff, and the time it would have taken to read plaintiff's entire deposition, the judge committed no error. Moreover, the DOC had the opportunity to question plaintiff further about his deposition testimony, but instead, it improperly sought to read the entire deposition to the jury. Therefore, the judge did not abuse his discretion in his rulings regarding the DOC's

use of plaintiff's deposition testimony.

B.

The DOC contends the judge abused his discretion by barring the introduction of statements cadets made to Salaga on the morning after the ICA and Salaga's and Schoettmer's reports regarding the incident on hearsay grounds.  We agree, in part.

Hearsay is a statement, other than one made by the declarant at trial, offered to prove the truth of the matter asserted.  N.J.R.E. 801(c).  Thus, if evidence is not offered for the truth of the matter asserted, it is not hearsay and is admissible.  State v. Long, 173 N.J. 138, 152 (2002).

The DOC first cites the judge's decision to sustain an objection when Salaga was asked what a cadet told him about the ICA. Given the way the question was framed, this was clearly offered for the truth of the matter asserted.  The DOC does not claim an exception to the rule against hearsay as a basis for its admission. Therefore, the judge did not abuse his discretion in sustaining this objection. However, the judge improperly barred admission of Salaga's report as hearsay when it should have been admitted as a business record under N.J.R.E. 803(c)(6).

N.J.R.E. 803(c)(6) creates an exception to the rule against hearsay for a statement contained in a writing "if the writing or other record was made in the regular course of business and it was the regular practice of that business" for such

21

writings to be made, "unless the sources of information or the method, purpose or circumstances of preparation indicate that it is not trustworthy." The DOC cites to Carmona v. Resorts Int'l Hotel. Inc., 189 N.J. 354, 379 (2007), where our Supreme Court held the trial judge erred in excluding a company investigative report concerning the plaintiff solely on the basis that it was inadmissible hearsay. The Court remanded for a redetermination as to whether the report was admissible because it found, subject to the requirement that one of the decision makers knew of its contents and all portions of the report were separately admissible or properly and intelligibly redacted, the report would be admissible as a non-hearsay statement to show the company terminated the employee for non-pretextual reasons. Ibid. The Court added:

> We hold that, within the usual limits that govern the admissibility of evidence as a whole, an investigative report concerning an employee is admissible as non-hearsay statements whenever the employer's motivations are directly at issue. . . . Moreover, in the specific context of a LAD retaliation claim . . . we see no appreciable difference between a personnel file . . . and an investigative report.
>
> [Id. at 376-77.]

Here, the DOC sought to admit Salaga's report to support its claim that it had legitimate, non-discriminatory reasons for transferring plaintiff to Wagner after the ICA incident. Therefore, barring Salaga's report was an abuse of discretion requiring

reversal.

C.

The DOC argues the judge abused his discretion in permitting plaintiff's psychological expert, Jacob Steinberg, to testify as to plaintiff's credibility. We agree.

Initially, Steinberg testified as to his opinion regarding Milutin. He was asked, "Did you believe Mr. Milutin was exaggerating or telling you things that would help his report when he was relaying this to you?" The judge overruled the DOC objection to this question. Steinberg then answered that Milutin was an "incredibly sincere individual. He's a highly ethical man with integrity. . . . I did not believe that he was exaggerating at all. I think he was quite truthful."

After stating there was nothing plaintiff reported that was inconsistent with his diagnosis of plaintiff,[4] Steinberg was asked whether he found plaintiff to be credible. The judge overruled the DOC's objection to this question. Steinberg then answered, "Absolutely." When asked why he found plaintiff to be credible,

---

[4] Steinberg testified that plaintiff suffered from stomach and back problems, as well as sleep problems and headaches, all of which Steinberg attributed to work-related stress. In addition, Steinberg testified that the problems at the Boot Camp affected plaintiff's marriage and parenting. He concluded that plaintiff suffered from moderate depression and diagnosed him with an adjustment disorder with depression and anxiety. Steinberg attributed this condition to the events that followed the ICA.

23

Steinberg answered:

> [Y]ou get a sense of an individual and how they present. He's a very honorable man. I think he would have a hard time lying. But the context of it could be confirmed. There was information that was available regarding what happened to him. I didn't feel that he would misrepresent anything because there are Internal Affairs data that would be available to . . . find consistent with his presentation, his report.
>
> . . . .
>
> Again, [plaintiff is] an individual with integrity, honor, that's what he's all about
>
> . . . .
>
> So again, with tremendous integrity and honor, which is important for this individual, to be accused of something [like the ICA incident] is incredibly disturbing.

The DOC later requested a curative instruction, but only with respect to Milutin. The judge declined to give such an instruction at that time and said he would address the issue at the final charge conference. The judge stated that had, the DOC objected, he would have sustained the objection; however, the DOC had, in fact, made objections. The judge added:

> I understand your request for a curative instruction, but . . . I'm going to be readdressing it again in closing, at the time that it matters most, with specific instances of conduct – specific instances of fact. . . . I'm not finding that there was anything improper with what Dr.

24

Steinberg did, given the nature of his testimony or what he was asked to do.

In his final charge to the jury, the judge instructed:

> Credibility is solely an issue for you, the jury. No other witness' opinion or testimony, including that of Dr. Steinberg, can be used to supplant your unique role as the assessor of a witness' credibility. You must evaluate credibility based upon your own observations of the witnesses presented at trial.
>
> Finally, you are not bound by the testimony of an expert. You may give it whatever weight you deem it appropriate. You may accept or reject all or part of an expert's opinion.

In denying the DOC's post-trial motion, the judge held that permitting Steinberg to make credibility assessments of plaintiff and Milutin, and the judge's failure to give a curative instruction, did not warrant reversal because he used Model Jury Charges (Civil), "Expert Testimony" (1995) in the final charge.

"There is no basis in our law for the expression of an expert opinion as to the truthfulness of a statement by another witness. . . . Our rules do not allow such bolstering." State v. J.Q., 252 N.J. Super. 11, 39 (App. Div. 1991). Rather, "credibility determinations are reserved to the trier-of-fact, judge or jury[.]" Capell v. Capell, 358 N.J. Super. 107, 109 (App. Div. 2003). Thus, permitting Steinberg to testify that plaintiff was a "very honorable man," who "would have a hard time lying," and who Steinberg believed was credible and would not "misrepresent

anything," constituted impermissible bolstering of plaintiff's credibility. The judge's final charge to the jury was insufficient to cure this error, given the passage of time between the testimony and the charge and the judge's failure to immediately address the particulars of Steinberg's credibility testimony. Accordingly, the judge abused his discretion in permitting this testimony from Steinberg.

D.

The DOC contends the judge abused his discretion in admitting "propensity evidence" regarding Loury and Nyahuma. We agree.

Loury was asked on cross-examination about growing up in Darby Township, Pennsylvania. On direct examination, he had testified that Darby was a "good nuclear community." In attempting to impeach Loury, he was asked on cross-examination about his involvement in forming a solely African-American community within Darby. The judge overruled the DOC objection to this question. Loury was then asked whether he was a member of a group called "Concerned Citizens." He denied being a member, but acknowledged that a lawsuit was filed against Darby for racial discrimination and retaliation, and stated Darby "had issues." Loury was then asked whether he read a speech called "Getting off the Plantation," which referred to Caucasian public officials in Darby as "lackeys" and recommended that people join Concerned Citizens. The DOC again objected, and

the judge overruled the objection. Loury answered that he had written a term paper with that title and references.

Loury was asked on cross-examination whether he was a member of an African-American fraternity while in college. The DOC objected on relevancy grounds and because the question sought to elicit "propensity" evidence. The judge tentatively permitted the question, after which Loury was asked whether the fraternity had any Caucasian members. The DOC again objected on relevancy grounds, and the judge overruled the objection. Loury testified that the fraternity was created to promote African-American unity in the United States, but it had some Caucasian members.

Loury was also asked on cross-examination whether he "ever espoused the belief that the jails are predominantly filled with black inmates and juveniles because of overzealous white cops." He answered in the negative. He agreed he had been quoted in an article in Crisis Magazine, a publication of the NAACP, regarding bias and racism in the criminal justice system. He was asked other questions about the article, including his references to African-American inmates as "brothers" whom he sought to "rescue." He was asked, "what about rescuing white inmates or Hispanic inmates? That wasn't a concern of yours?" Loury replied, "I'll help anybody."

In denying the DOC's post-trial motions, the judge stated (regarding Loury's cross-examination):

> Under [N.J.R.E.] 611(b), parties are allowed to cross-examine witnesses on any matter affecting a witness' credibility. In addition, [N.J.R.E.] 607 allows parties to introduce extrinsic evidence affecting the credibility of that witness. Furthermore, if [p]laintiffs had brought forth evidence as [N.J.R.E.] 404(b), the testimony would have been proper to show . . . Loury's motive or intent towards [p]laintiffs. In the case at bar . . . Loury unlawfully retaliated against the [p]laintiffs following their participation in . . . Ronda's EED complaint and their own complaints of racial harassment. Therefore, . . . Loury's intent was "relevant to a material issue in dispute" and proper under N.J.R.E. 404(b).

Although N.J.R.E. 607 permits a party to introduce extrinsic evidence to impair the credibility of a witness, the rule is not without limits. State v. Darby, 174 N.J. 509, 520 (2002). N.J.R.E. 404(b) excludes evidence of other crimes, civil wrongs, or acts "when such evidence is offered solely to establish the forbidden inference of propensity or predisposition." State v. Nance, 148 N.J. 376, 386 (1997). However, that evidence may be admissible for other purposes, such as motive or intent, when relevant to a material issue in dispute. State v. Eatman, 340 N.J. Super. 295, 301 (App. Div. 2001). In addition, N.J.R.E. 403 authorizes a trial judge to exclude evidence when its probative value is substantially outweighed by the risk of undue prejudice.

A-3387-15T1

"In this weighing process, evidence that has overwhelmingly probative worth may be admitted even if highly prejudicial[l]", if that evidence is central to the case. Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 496 (1999). The question then is "whether the undeniable prejudicial effect of this evidence substantially outweighed its probative worth." Id. at 500. In making that determination, "courts should look not only to the close nexus between the evidence and a central issue in the case, but also to the availability of other evidence [that could] shed light on that issue." Ibid.

Loury's racial attitudes were relevant in this case involving racial discrimination. Plaintiff offered testimony that Loury made racial remarks on a number of occasions. However, it is significant that Loury was not asked on direct examination whether he made these racial remarks, and therefore, never explicitly denied making them. For plaintiff to then introduce the challenged evidence to attack Loury's credibility was not only prejudicial, it was unnecessary. Loury's credibility as to whether he made racial remarks was not at issue at that point.

In addition, in summation, plaintiff's counsel used this evidence to tell the jury that Loury "blamed racist white cops for the reason why jails are over populated with African-American inmates." Any relevance that statement had was outweighed by the substantial prejudice it could have engendered. Therefore, on balance, the judge abused his discretion in permitting this evidence, as it should have been excluded as

A-3387-15T1

inflammatory and unduly prejudicial under N.J.R.E. 403.

The DOC also objected unsuccessfully on N.J.R.E. 403 grounds when plaintiff elicited testimony from Mellick that Nyahuma had said he believed there should be "jihad" on Caucasians and walked down the hallway one night chanting "free Tookie," one of the founders of the "Bloods" gang on the evening he was to be executed. This evidence also should have been excluded under N.J.R.E. 403 because Nyahuma never testified, and thus his credibility was not directly at issue. The judge's failure to bar this evidence constitutes reversible error.

E.

The DOC argues that the judge abused his discretion in admitting evidence regarding the incident where Winters knocked over a cadet's bed causing the cadet to break his foot (the Winters incident) because it was improper rebuttal evidence. The judge initially expressed skepticism about admitting this evidence because the Winters incident occurred in 2004, before plaintiff started working at Boot Camp. However, the judge indicated he would revisit the question during trial.

During the DOC's opening statement, in referring to the ICA incident, counsel stated: "Protocol for something like this is to reassign someone and restrict them. It's a temporary thing at first while they're doing the investigation. . . . If it's true, if it's not true, we want to investigate and get to the bottom of this. This is standard

procedure."

During his direct examination, Milutin was asked if Winters was removed from Boot Camp after the Winters incident. In opposing the DOC's objection, Milutin's counsel argued the question was proper because the DOC had opened the door in its opening statement. The DOC argued the distinction between the two incidents was that the Winters incident was accidental, while the ICA was intentional. The judge overruled the DOC's objection and permitted the question, stating:

> [Y]ou made a very strong statement in your opening that if they commit an infraction against a cadet, they're shipped out. So . . . in this particular instance, they're entitled to at least examine . . . Milutin to see if, in fact, that was the case, as well as [plaintiff].

The judge continued:

> [Y]ou made it a blanket rule that if an inmate suffers something at the hands of a corrections officer, that corrections officer is shipped out, either pending an investigation or shipped out permanently if he's found guilty. You didn't make the distinction as to him being shipped out only when it's found to be an intentional act.

"Opening statements are not evidential and should not be responded to by 'rebuttal' evidence." State v. Anastasia, 356 N.J. Super. 534, 543 (App. Div. 2003). "If improper remarks are made by counsel, the remedy lies in a curative instruction

A-3387-15T1

to the jury or, if absolutely necessary, a mistrial. . . .  [A]n improper or erroneous statement made on opening is not properly corrected by allowing the introduction of prejudicial evidence that would otherwise be inadmissible." Ibid.; see also State v. Cordero, 438 N.J. Super. 472, 486 (App. Div. 2014) (noting that opening statement did not open the door to rebuttal N.J.R.E. 404(b) evidence).

We applied that principle in Velazquez v. City of Camden, 447 N.J. Super. 224, 228, 237 (App. Div. 2016), a civil rights action brought by a police shooting victim.  The defendants argued the court should have admitted evidence of the plaintiff's non-prosecution in the underlying incident after the plaintiff's attorney said in his opening that there was an attempted homicide investigation in the matter. Id. at 237.  In rejecting this argument, we noted that evidence of non-prosecution in a criminal matter was not admissible to show non-liability in a civil matter because of the different burdens of proof. Ibid.

The distinction between the above cases and this case is that the evidence sought to be admitted in rebuttal to the opening statements in the above cases was inadmissible.  There is no claim that evidence of the Winters incident was inadmissible, except on general relevancy grounds, as the judge initially speculated. Whether this distinction warrants a determination that the opening statement could open the door to rebuttal evidence is an open question.  However, because plaintiff

apparently intended to introduce the evidence at some point during his direct case to support his disparate treatment claim, the Winters incident should not be viewed as the type of evidence courts have found to be impermissible rebuttal evidence to opening statements. Therefore, the evidence was admissible, but not for the reason the judge expressed.

F.

The DOC argues that the judge abused his discretion in admitting so-called "gossip evidence" regarding racial comments made outside plaintiff's presence. Prior to the start of trial, the judge ruled that testimony about acts or words of discrimination to which plaintiff was subject, or which he witnessed first-hand would be admissible. The judge added:

> If plaintiff was not present, [the non-party witness] couldn't testify to it. He can't because this case is about a hostile work environment as characterized by [plaintiffs]. . . . [G]ossip is gossip. Hearsay is hearsay . . . . Witnessing . . . one of their colleagues being subjected to derogatory comments based on race or some other level of hypocrisy, that's what creates the hostile work environment as perceived through [plaintiff's] observations.

During LaPierre's direct examination, he was asked whether Loury directed any racial comments to him. The DOC objected, citing the judge's previous ruling. However, the judge overruled the objection, stating:

> We're talking about an environment as . . . presented by the plaintiffs . . . [that] didn't necessarily start when they got there. It's something that they were exposed to for the first time. But it's an environment that apparently had existed prior to their arrival. And it all goes to a continuation of this environment as a hostile work environment and to [its] extent.

LaPierre then testified that Loury directed racial comments at him, including "white boy," "cracker" and "onion." He also testified he heard Butler, Winter and Nyahuma make racially derogatory comments about plaintiff and heard Loury call plaintiff an "onion," "cracker," and a "good ol' boy."

The judge permitted Cheesman to testify that officers complained to him about Nyahuma using the term "cracker," and he directly heard Caucasian officers referred to as "you guys with the hoods." In addition, the judge permitted Mellick to testify that he heard Nyahuma call Caucasian officers "crackers" and "punk-asses."

In denying the DOC's post-trial motions, the judge rejected the DOC's contention that he had improperly admitted so-called "gossip evidence," or comments other witnesses heard being made about plaintiff, Milutin, and other Caucasian officers. The judge held that such evidence was "relevant because the fact that other employees were harassed tends to substantiate [p]laintiff['s] claim of discrimination and hostile work environment . . . [and] is also relevant to prove [the

DOC's] knowledge or awareness of the existence of a hostile work environment."

The DOC incorrectly describes the evidence in question as "gossip evidence." Such evidence is "idle talk or rumor," consisting of out-of-court statements. Fitzgerald v. Stanley Roberts, Inc., 186 N.J. 286, 315 (2006). However, this is not the type of evidence in dispute here. Rather, the disputed evidence consists of specific comments that were directed to, or overheard by witnesses who testified at trial, not plaintiff.

To establish a hostile work environment, "a plaintiff must marshal evidence of bad conduct of which [he or she] has firsthand knowledge." Godfrey v. Princeton Theological Seminary, 196 N.J. 178, 201 (2008). "Thus, in addition to evidence of harassing conduct directed at the plaintiff, a plaintiff may also attempt to demonstrate the existence of a severe or pervasive hostile environment by presenting evidence of harassment by the perpetrator that was directed at others and that the plaintiff witnessed." Id. at 201-02 (emphasis added) (footnote omitted). A plaintiff need not have been the target of the offensive conduct, but must have witnessed the offensive conduct directed at other employees. Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 611 (1993); see also Fitzgerald, 186 N.J. at 319 (harassment of which a plaintiff is entirely unaware cannot contribute to a hostile work environment because the plaintiff does not experience it).

The testimony regarding what the witnesses heard others say about plaintiff would not violate the above law because it was not "directed at" the witnesses. However, the racial epithets directed at LaPierre by Loury, Cheesman's testimony that officers complained about Nyahuma's use of the term "cracker," and Millick's testimony that he heard Nyahuma call Caucasian officers "crackers," were not admissible because they were directed at another employee and were not witnessed by plaintiff. Accordingly, we conclude the judge erred by admitting the evidence in question.

G.

The DOC argues the judge abused his discretion in permitting plaintiff to elicit testimony as to the credibility of another witness. We disagree.

Loury was asked on cross-examination whether he ate lunch with Norris at a particular diner once a month. Loury testified he did not believe it was once a month. He was then asked whether, if Norris said it was once a month, "she'd be lying[.]" Loury replied, "I don't know. You'd have to ask her." Loury was also asked whether he spoke to Norris shortly before she was deposed in the case, and he said no. He was then asked, "if she said that happened, . . . she'd be lying," to which Loury replied, "[s]he would be lying." The DOC did not object to either question.

Asking a witness to assess the credibility of another witness is prohibited. State v. Bunch, 180 N.J. 534, 549 (2004). However, since the DOC did not object to the questioning, and Loury was not asked to assess Norris's general credibility but rather was asked whether he believed she told the truth in two specific instances of which he had direct knowledge, the questions did not constitute plain error. In State v. T.C., 347 N.J. Super. 219, 237-38 (App. Div. 2002), we held that the defendant's failure to object to a question which was directed to her as to whether another witness was lying, did not constitute plain error because there was no showing of any prejudice. We noted that the questioning involved specific inconsistencies between the two witnesses. Id. at 238. For similar reasons, we find no plain error here.

In sum, we hold that the erroneous evidentiary rulings in this case deprived the DOC of a fair trial. Accordingly, we reverse and remand for a new trial. Having reached this conclusion, we need not address the DOC's additional arguments that: (1) the judge erred in denying the DOC's motions for a directed verdict and judgment notwithstanding the verdict (JNOV) regarding punitive damages; (2) the judge erred in denying the DOC's motion for JNOV, a new trial, or remittitur as to pain and suffering; (3) the jury charges and jury verdict sheet were a miscarriage of justice under the law; and (4) the judge erred in denying the DOC's motion for a directed verdict and JNOV on plaintiff's disparate treatment, retaliation, and hostile work

37

environment claims. We also need not address plaintiff's cross-appeal.

However, we address the DOC's contention that the trial judge was not impartial. The DOC argues it was denied a fair trial because of a statement the judge made in denying its post-trial motions. This argument lacks merit.

Near the end of the argument on the DOC's post-trial motion, the judge, in discussing why punitive damages were warranted, stated:

> But, look, if you've never been called a racist name before, you don't really know what it feels like until you are. I say that as a person of color. I'd rather be smacked in the face rather than somebody calling me a Spic. Because a smack in the face heals, the name Spic sticks with you for the rest of your life. I say Spic because that's the common derogatory for Hispanics, of which I am. And to be in an environment where I can do nothing to change it, to change the culture of it, and the environment is one where it's [comprised] of public servants working for the people carrying out a responsibility, to be in that kind of environment where you can do nothing to change it and just have to continue to swallow everything you're put through, the stressors that these two individuals went through based on the racism, which apparently was prevalent at this particular boot camp, the level of racism itself was reprehensible. What they were subject to was even more so.

The DOC did not object to this statement. Therefore, the issue is one of plain error, and the DOC must show the statement was clearly capable of producing an unjust result. R. 2:10-2.

The DOC did not object or move to disqualify the judge after his statement. "[I]t is unnecessary to prove actual prejudice on the part of the court . . . rather, 'the mere appearance of bias may require disqualification,'" so long as that appearance is objectively reasonable. Chandok v. Chandok, 406 N.J. Super. 595, 603-04 (App. Div. 2009) (quoting Panitch v. Panitch, 339 N.J. Super. 63, 67 (App. Div. 2001)). The question is, "[w]ould an individual who observes the judge's personal conduct have a reasonable basis to doubt the judge's integrity and impartiality?" In re Reddin, 221 N.J. 221, 234 (2015).

Aside from the fact that the judge made the statement after he had already ruled on the post-trial motions, the DOC fails to show how the statement created a reasonable basis to doubt the judge's impartiality. The judge did not state he had been a victim of discrimination. Moreover, this was a jury trial and the judge did not make the punitive damages award. We are satisfied the judge's statement was not clearly capable of producing an unjust result.

Reversed and remanded for a new trial.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3387-15T1